Muriel Pressman NELLIS, Appellant,

v.

Howard S. PRESSMAN, Appellee.

No. 5911.

District of Columbia Court of Appeals.

Argued Aug. 17, 1971.

Decided Oct. 20, 1971.

Jean M. Boardman, Washington, D. C., for appellant.

Philip Shinberg, Washington D. C., for appellee.

Before KERN, GALLAGHER and REILLY, Associate Judges.

GALLAGHER, Associate Judge:

Appellant, Mrs. Muriel Pressman Nellis, seeks reversal of an injunction ordering her to refrain from causing her children, Amy and Adam, to be known by any surname other than their father's, Mr. Howard Pressman (appellee). The facts are lengthy and complicated and require a rather full recital.

Mrs. Nellis was married to Mr. Pressman on March 25, 1951. During this marriage, which ended in divorce on October 18, 1964, two children were born. Adam is now 16 years old,[1] and his sister, Amy, is now about 13 and a half.[2] Shortly after the divorce, Mrs. Nellis married her present husband, Mr. Joseph Nellis, and since then she and the children have resided with him in the District of Columbia. The father, Mr. Pressman, resides in Chester, Pennsylvania.

In the fall of 1965 or 1966, Mrs. Nellis, without notifying Mr. Pressman and because Adam often told her of discomfort because his name was different from the Nellis family, enrolled the children in school with Adam's assent under her new surname. For the last five or six years Amy and Adam have continuously used the surname Nellis, except when visiting their natural father at his residence in Pennsylvania where they are known as Pressman. The earliest indication of an awareness by Mr. Pressman of the change in name is a letter

---

1. He was born on October 8, 1955.

2. She was born on April 20, 1958.

he wrote to Mrs. Nellis' attorney in Pennsylvania on October 31, 1967, concerning visitation rights in which he complained about "changing my children's names in school to Nellis."

On June 20, 1968, Mr. Pressman filed a suit for custody of the children. Subsequently, his complaint was amended to withdraw the custody demand and to request merely a final settlement of visitation rights; but no claim concerning the proper surname of the children was raised until the complaint was orally amended to include the issue at the beginning of the trial in June of 1970.

Neither child knew their name was an issue in the trial though both children participated in it and were questioned about the change in names. The court issued a judgment which, as well as fixing visitation rights, enjoined Mrs. Nellis from "using, or allowing to be used, in any manner or circumstance whatsoever, any names for said minor children other than 'Adam Jay Pressman' for the male child and 'Amy Ellen Pressman' for the female child." Mrs. Nellis received from the trial court a retrial on the issue of the children's surname, but applications by the children to intervene, filed by Mrs. Nellis as next friend, were denied.

The retrial took place in April 1971, with all interested parties and three expert witnesses testifying. Much of the testimony at the retrial centered on Adam's reaction to the order requiring that his mother effect a return to the name Pressman.

Since neither Adam nor Amy had been informed that their name was an issue at the original trial in June, Adam testified he was surprised as he read a copy of the trial court's opinion and order enjoining use of the name (he first saw the order on the weekend of his 15th birthday). His reaction was strongly adverse. During the next few days he had long telephone conversations with his father at his home in Pennsylvania concerning the injunction. They further discussed the question when Adam visited his father at Thanksgiving but did not arrive at any agreement. His opposition to a return to the name Pressman remained constant during the winter, and at the retrial he expressed an intense desire to retain his name as Nellis.

Adam said he has a deep interest in retaining his name as it is while his name is of little tangible benefit or detriment to his father. He had lived as Nellis so many years that to revert now to the Pressman surname would present grave problems for him and would cause him "pain and anguish." It seemed to him that his father was asking for a sacrifice which would result in little of appreciable significance for his father. He said that prior to the court order his relations with his father had been good—he loved him and enjoyed visiting him—but now he felt differently. He was afraid that if forced to return to the name Pressman he would not be able to develop any relationship with his father, and that he "might just stop going to visit him." [3]

A child psychiatrist appearing for appellant supported Adam's opinion that he would be harmed by returning to the name Pressman. According to the expert testimony, Adam's motives for so strongly opposing Mr. Pressman go well beyond any mere inconvenience in explaining the change to friends. Rather, Adam now feels himself to be a Nellis because for five or six years during the critical and formative development of the adolescent he has grown up in the community as Nellis. Due to good family training,

* * * [the children] made the best of the situation they have been in * * *. This is what they know. This is what they have put into it. They have made

---

3. In an affidavit for Mrs. Nellis on August 12 accompanying a motion to stay it is stated that Adam has refused to visit his father this summer despite the court order granting Mr. Pressman custody of the children for the months of July and August. Mr. Pressman declined to exercise his right and force Adam to visit him.

their adaptations, and this is Adam right now. So, that, when you try to change his name, in my opinion, it's symbolic of trying to break him. He's a mature boy for his age of 15 and he is further along in this process.

If this happened in other years, earlier, I would say probably his feelings would be different. But, now, his feeling toward his father is very troubled, because he would like his father to know that this is him now, and he would hope his father would want the relationship, the affection and respect, above a name change, because to the boy this is tied up with who he is. [Tr. at 255–56.]

In opposing the children's return to the Pressman surname, Mrs. Nellis stressed the same factors of self-identity and relations with others which were brought out in the psychiatrist's testimony. She especially feared the effect that "dislocation" might have on Adam at a point in his life where he was "trying very hard to find a real place for himself in society, and aspiring to be something and to be someone."

Although Amy was not as strenuously opposed to returning to the name Pressman as her brother, that is, she did not anticipate severing her relations with her father if she is required to use his surname, she did define her strong desire to retain her present status as Amy Nellis. She articulated her conviction that her best interest lay in maintaing the status quo and maintained this position during searching cross-examination.

Mr. Pressman testified that the children's use of his surname was critical to the maintenance of a sound and durable relationship between himself and his children. He said it is not natural for children to carry their mother's name. He believed that the children were living in a "dream world" in which they were or would in the future be embarrassed to even introduce their natural father to their friends. He felt that Adam's present hostility toward him because of the court order requiring a change back to the name Pressman can be altered by the enforcement of the injunction, though this means "compulsion."

In support of his position was a psychiatrist who testified children are better off, generally, in having their natural parent's name; that use of the surname Pressman was important to the children's relationship with their real father; that continued use of Nellis would, in effect, be a hiding from a reality which should be faced and dealt with; and that being an adolescent it is a good time to make the transition.

The trial court issued an order which once again enjoined appellant from causing the children to be known by any surname other than their natural father's.

We may say at the outset it is difficult to avoid the comment that this is an issue which it would have been more desirable to resolve, or at least attempt to resolve, without injecting it into a judicial proceeding. It would have been better if the mother had consulted with the father about the problem brought to her by her son before causing the name changes to occur in the lives of the children. On the other hand, it would have been better if the father had tackled the problem directly when he first became aware of the name changes no later than October 31, 1967. Not only that, it would certainly have been better judgment on his part to have first discussed his objections with the children, and the mother, rather than raise it directly for the first time five or more years later by way of an oral amendment to the complaint at the outset of the trial in this case. Having said this, the fact remains that the issue is before us for resolution. We may say that in deciding this case we at no time give consideration to any error in judgment by either parent—which parent was right or wrong—lest this becloud the real issue of the true interests of the children. Necessarily, though, the father's inaction for five years or more comes into play in assessing the fundamental issue, as we see it, but it is only in that context we consider it. We are aware of no appellate decision in

this jurisdiction on the problem involved, and counsel cite none.

It may be well first to clear away some of the underbrush and say what this case is not about. It is not a case involving a petition to change the names of children under the statutory procedure and where no change has yet occurred in actuality. D.C.Code 1967, §§ 16–2501 to 16–2503. It is not a case where a name change in school records, etc., has occurred and the father promptly upon learning it protests and seeks an injunction before the new name takes hold. Mark v. Kahn, 333 Mass. 517, 131 N.E.2d 758 (1956). Nor does it involve a name change of children of tender years who clearly are not in a position to understand the implications or to convey their wishes with the intelligence and comprehension necessary to give weight to their testimony. Degerberg v. McCormick, 41 Del.Ch. 46, 187 A.2d 436 (1963). And, importantly, as we will see, neither is it a case where it need be considered that if their names are changed away from the father's name "the bond [with the father] may be weakened if not destroyed." Mark v. Kahn, *supra.*

The trial court posed the "basic question" as being whether the "substantial interest" of the children "require[s] a change of name or whether their complaints fall into the 'category of inconvenience or embarrassment.'" The ultimate findings of the court were that (a) the best interests of the children do not require that they be known by the name Nellis, and (b) their substantial interests do not require a change of name from that of their natural father as his name is (1) "not positively deleterious" to the children and (2) the natural father has been guilty of no misconduct justifying a forfeiture of his rights.

The principal error of the trial court, and the one which we believe led to a misjudgment of what constituted the real is-

sue in the case, was in viewing the fundamental question presented as whether there should be a name change from the father's name (Pressman) to that of the stepfather and mother (Nellis). The actuality is that for all practical purposes the name changes took place at least five years ago, realistically though not legally, and the problem here is whether another change back to the father's name should now take place. It seems to us that in reaching a decision in the particular circumstances of this case it would be wrong not to recognize the reality that name changes previously occurred even though the statutory procedure (D.C.Code 1967, §§ 16–2501 to 16–2503) for change of name was not pursued and no court approval was obtained. The fact is that in their daily lives their names have been Amy and Adam Nellis, and as the years went by this identity became more firmly imbedded in their minds and in the community where they live.

In its opinion, the trial court relied upon Mark v. Kahn, 333 Mass. 517, 131 N.E.2d 758 (1956) and Ouellette v. Ouellette, 245 Or. 138, 420 P.2d 631 (1966).

*Mark,* too, was a case of first impression and also involved an injunction sought by a natural father to prevent a divorced mother from registering their child in school in the name of the child's stepfather and mother. The court reversed an injunction and remanded the case for further proceedings because it concluded the trial court did not adequately consider the controlling issue of what was the best interest of the child but, rather, appeared to be unduly influenced by the motivation of the mother in seeking to effect the name change in school.[4] In so doing, the court laid down guidelines which we summarize:

(a) Children ought not to have another name foisted upon them until they reach an age when they are capable of making

4. Similarly, we conclude the trial court here did not adequately consider what we find to be the controlling issues. We note that here, too, the trial court in its opinion

evidenced some concern about the mother's motivation, though the best interests of the children are the real issue.

an intelligent choice in the matter of a name.

(b) The bond between a divorced father and his children is tenuous at best and if their name is changed the bond may be weakened if not destroyed; and the name under which a child is registered in school goes far to effect a name change.

(c) When a father supports a child, manifests a continuing interest in him, is guilty of no serious misconduct and *without unreasonable delay objects to an attempted change of name,* the court should decide the issue by *determining what is for the child's best interest.*

(d) A change of name may not be in the *child's best interest* if the effect of such change is to contribute to a further estrangement of the child from a father who exhibits a desire to preserve the parental relationship.

Considered in their entirety, the court in *Mark* laid out essential tests going to "the child's best interest." Mark v. Kahn, *supra,* 131 N.E.2d 758 at 762.

We have no problem with those general guidelines. But we do not read those considerations as requiring the issuance of the injunction here because of largely undisputed evidence in this case. Here, the boy (Adam) is 16 years old, is highly intelligent (upper 2 percentile nationally), a member of the Key Club in his high school (civic and service organization) and has been invited to membership in Junior Achievement, a national arm of the Chamber of Commerce. His sister (Amy) is 13 years old and also very intelligent and mature for her age. She has been appointed to an Advisory and Film Evaluation Board on drug abuse as the only child representing her age group to that Board. Her function is to view films on drug abuse and from her age-group's standpoint evaluate them for the purposes of the relevance and credibility of the films for children. It would appear that in determining the best inter-

ests of the children, their views on their names are entitled to be weighed commensurately.

Secondly, it is not seriously disputed that there was a good relationship between father and child during all the years of the name change and, more particularly as to the boy, until notified about the entry of the injunction in this proceeding. Additionally, the court in *Mark* recognized a significant problem if an unreasonable delay ensues before the father objects to the name change.

The trial court also placed considerable reliance on Ouellette v. Ouellette, 245 Or. 138, 420 P.2d 631 (1966). There, the trial court upon complaint of the divorced father issued a decree preventing the mother from changing the names of their three children (ages 14, 13 and 9) from "Ouellette" to "O'Let." On appeal, the court concluded appellant's position that (a) no change of name was involved but merely a change of spelling, (b) the new spelling was preferred by the children, and (c) the welfare of the children was furthered because the new spelling was more convenient, was too lacking in substance to warrant consideration. In so deciding on those facts, the court stated that "[w]here the father, as here, objects to a change in name and is guilty of no inattention to the child or other misconduct so serious as to make it for the best interest of such child that his name be allowed to be altered, then the court should refuse to permit such change * * *." Ouellette v. Ouellette, *supra* at 633.

In the circumstances of *Ouellette,* we would agree with the court's decision but we do not read it as persuasive here due to material factual distinctions. The issue here is more complex if only because of the five or more year lapse without direct action by the father, during which the names of the two children became imbedded in their community as Nellis.

On the other hand, in Bilenkin v. Bilenkin, 78 Ohio App. 481, 64 N.E.2d 84 (1945),

under circumstances quite similar to this case, the court declined to compel a mother to change a child's name on school rolls (and other places) back to the name of the divorced father. The court stated:

> The trial judge points out that this practice of registering the minor daughter of the parties in the name of Salesky had been followed from the time that the plaintiff had moved with her husband to their present residence. The home of the child is hundreds of miles removed from that of her father and it does not reasonably appear that he will be materially affected, one way or the other, by reason of the fact that his child there carries the name of Salesky. On the other hand, it may be very embarrassing and the source of some humiliation to the daughter if at this time the plaintiff should be required to no longer carry the daughter's name as heretofore known among her associates. Had the request been made of the Court when the facts first came to the attention of the defendant, it would present a different and more difficult question. [78 Ohio App. at 484–485, 64 N.E.2d at 85–86.]

We do not consider *Mark* and *Ouellette* as being worthy of the weight apparently given them by the trial court.

In our view, the issue is not as the trial court viewed it—whether a name change to Nellis is required—because this is the name they have been carrying for more than five years, and this without direct complaint by the father to the mother or children, and without meaningful action by him until the outset of the trial.[5]

It is stated in the dissent that the father "should not be blamed for the law's delay";

and that the father should not be "charged" with permitting the name Nellis to become imbedded because for four or five years he has been taking "all feasible legal steps" to stop the practice. But, as we have said, this is not a case for blaming anyone. Otherwise, the true issue of the children's best interests could get lost and they might become pawns. The fact remains the only "feasible legal step", that is, application for an injunction, was not taken until June of 1970 notwithstanding that the father learned of the usage of the name Nellis sometime before October 31, 1967.[6] So there was no "law's delay" actually involved. We do not take seriously in this context, as the dissent does, that the father at one time filed a complaint for custody of the children because (a) the father is the first to say the children have been very well raised by the mother and stepfather, and (b) perhaps for this reason, the complaint for custody was withdrawn before trial.

We do not view this case as involving the traditional concept that the discretion of the trial court should not be disturbed unless an abuse of it is apparent. Rather, as we have said, the trial court has simply not evaluated the true problem in this novel case of first impression. In considering the real question posed, we believe that the record is sufficient to permit a final determination by this court of the issue rather than prolong this already protracted litigation.[7]

Under the special facts and circumstances of this case, we think an injunction should not be issued requiring the mother to take all available steps to cause the children to revert to the name Pressman. We say this because (a) the children have been known in this community for more than five

---

5. In evaluating the evidence bearing upon the real issue, the views of the mother are also entitled to consideration.

6. In his letter of October 31, 1967 to a co-arbitrator selected by the father and mother to work out visitation rights, Mr. Pressman stated his views on the visitation problem and remarked in conclusion that changing his children's names in school

was not in aid of a good relationship between the children and him. We do not view this as a "feasible legal step."

7. There have already been two trials and, especially in the second trial which solely concerned the name change, all parties have given complete testimony. In addition, three expert witnesses have testified.

years as Nellis and had a good relationship with their father during those years, (b) their name and identity as Nellis have become imbedded in their own minds as well, (c) the likely impact on their lives of changing back again after all these years to the name Pressman, (d) the children's views are entitled to serious consideration because of their ages and level of intelligence, (e) the reality that the son is approaching the age (18) when he will be eligible to vote and, if necessary, serve in the armed forces and is therefore not far from the time when his wishes on his name would be difficult to deny, (f) the effect the injunction has already had in their lives and on the relationship with their father, and (g) the father's physical remoteness from the community where the children reside.

We agree that, generally speaking, children should carry the name of their natural father unless there are countervailing considerations which outweigh this. If this were a case where an injunction had been issued before the name of Nellis had taken hold, we might well be disposed to a different result. But here the lapse of time was so long things had reached the stage where there was presented an individual social problem not adaptable to solution by an injunction. Even though a court in equity may have jurisdiction, not every individual social problem presented to it should be considered subject to solution by judicial compulsion, and we think this is one now better left alone. We can only doubt that what the father apparently hoped to achieve by way of an injunction—assurance of a good and lasting relationship with his children—is in the power of any court to give.

In vacating the injunction, we are hopeful that the father's forebodings on his future relationship with his children if he does not prevail will not prove true. It may well be that the father and children, having bared their souls, will have a warm reunion and become closer than ever. They all seem to have the character, feeling and intelligence to do so.

Reversed with instructions to vacate the injunction.

REILLY, Associate Judge (dissenting).

In my view, reversal of the trial court in this case cannot be reconciled with leading decisions of this court in domestic relations matters. Until today, it had been our rule that unless the trial judge's findings of fact lacked evidentiary support or a clear abuse of discretion was shown, his decree should not be disturbed.[1] Obviously this is not the situation here, for (1) the subsidiary factual findings of the trial judge are not challenged, and (2) the reasons for his ultimate conclusion are set forth in two learned and lucid opinions, amply supported by citations to judicial authority.

This court has repeatedly held that even on such major controversies as disputed custody of children, a trial judge's disposition of the competing claims of divorced parents should be permitted to stand even though a reviewing court, or other trial judges, on the same record might well have reached a different result. Coles v. Coles, D.C.App., 204 A.2d 330 (1964). We strongly reaffirmed the principles enunciated in that opinion in a recent decision even though—in contradistinction to the case before us on appeal—no written findings were made by the trial judge. Dorsett v. Dorsett, D.C.App., 281 A.2d 290 (decided September 22, 1971.)

*Dorsett* was also a case where the trial judge decided that the father should be the guardian of a child of tender years

---

1. Rutledge v. Harris, D.C.App., 263 A.2d 256 (1970), falls into the first category. There, a decree awarding the custody of children to a father was based upon a finding that "there is no evidence indicating that [he] is an unfit person." That decree was indeed reversed by this court but on the ground that the record revealed "such factors as failure to support the children and previous parental indifference, possibly coupled with an ulterior motive to avoid support payments and gain the income from the social security payments * * *."

despite a concession that the mother was not an unfit person and a general presumption that as between divorced parents the child is better off with the mother. In refusing to substitute our judgment for that of the trial court, we quoted with approval the observation of Chief Judge Hood in the *Coles* case.[2]

Since what has been termed the classic decision on the subject, Chapsky v. Wood, 26 Kan. 650 (1881), most jurisdictions, including this jurisdiction, have accepted Judge Brewer's pronouncement that in child custody cases: "Above all things, the paramount consideration is, what will promote the welfare of the child?" This principle is easily stated but its application in a particular case presents one of the heaviest burdens that can be placed on a trial judge. Out of a maze of conflicting testimony, usually including what one court called "a tolerable amount of perjury," the judge must make a decision which will inevitably affect materially the future life of an innocent child. In making his decision the judge can obtain little help from precedents or general principles. Each case stands alone. After attempting to appraise and compare the personalities and capabilities of the two parents, the judge must endeavor to look into the future and decide that the child's best interests will be served if committed to the custody of the father or mother. He starts with the premise, as did the trial judge here, that the best interests of the child would be served by living in a united home with the affection, companionship and care of both father and mother, but that possibility has been eliminated before the case reaches judge. So, the question for him is what is best for the child within the limitations presented. When the judge makes his decision, he has no assurance that his decision is the right one. He can only hope that he is right. He realizes that another equally able and conscientious judge might have arrived

at a different decision on the same evidence. (Footnote omitted.)

In the instant case, the only matter raised on appeal concerns the surname to be used by children of divorced parents. Obviously such an issue pales in comparison with the problem posed to a trial judge by the selection of the particular divorced parent to whom the custody of a child should be entrusted. If the determination of such a question with all its serious and long range impact upon a child's future properly rests at the discretion of the trial judge who has heard the testimony and appraised the character and personalities of the persons involved, it is difficult to justify the intrusion of an appellate body upon a trial judge's disposition of a relatively trivial question.

Nevertheless, my colleagues hold that traditional deference in domestic relations cases to the judgment of the trial court is not warranted here because of an asserted failure on the part of the court below to evaluate the real issue. This, we are told, is not the question of whether there should be a name change from Pressman (the father's name) to Nellis (the name of the second husband), but rather whether another change back to the father's name is required, inasmuch as "for all practical purposes" the children's surname was changed to Nellis at least five years ago.

Pointing to the leading case of Mark v. Kahn, 333 Mass. 517, 131 N.E.2d 758 (1956) (where a divorced wife was being sued for registering her children at school under the name of her new husband), they say that the trial court erred in deeming this case a precedent because one of the guidelines laid down by the Massachusetts Supreme Court in that decision was that the father, who is supporting the child, is entitled to the kind of relief granted below if he "without unreasonable delay objects to an attempted change of name". According to the majority, the guidelines of the Massachusetts case were disregarded

---

**2.** *Id.*, 204 A.2d 330 at 331–332.

because the father here raised no timely objection until the name change had become "embedded" by five years or more of usage.

I cannot understand how this conclusion was reached for the record refutes any notion that appellee Pressman slept on his rights or was dilatory in any respect, once he learned the children were going under another name in Washington. Appellant never notified her former husband of the steps she had taken to bring about this situation and the record indicates that he was not aware of it until October 31, 1967. On that date he sent a letter to the lawyer who had negotiated the original custody agreement on behalf of the wife, warning that he considered this action a breach of their agreement.[3] Not getting any satisfaction and being further aggrieved by what he deemed a denial of visitation rights, he then suspended making support payments directly to the wife, but deposited the money to the children's account in a Pennsylvania bank.

The impasse continued and on June 17, 1968 he brought an action in the Court of General Sessions asking that permanent custody of the children be awarded to him (R. 326, 334). In this posture of the case it was scarcely necessary to put the mother on notice again that he was protesting her discontinuance of the use of his name by the children, for if he had succeeded in obtaining custody of them he obviously would have remedied the matter himself.

Thus it is incorrect to say that until the commencement of the trial on June 24, 1970 the surname issue was never directly raised. It was when the request for full custody was deleted from the complaint that the prayer was amended to request injunctive relief against the mother with respect to the name change. The lapse of an additional year and a half since that date has been entirely due to the success of the mother in obtaining a rehearing after the relief sought by the amended prayer was granted and the further time required to perfect her appeal. Except for a period of approximately a year when the application of the Nellis name to his children was unknown to him, the father, the mother has persisted in her course of action with full notice of her former husband's legal challenge to it. Obviously the father should not be blamed for the law's delay,[4] nor should he be charged with permitting the name Nellis to become embedded in the children's lives in the community for five years, when for four of those five years he has been taking all feasible legal steps to stop the practice.

Another guideline in Mark v. Kahn, *supra,* is that the kind of father entitled to relief should be one "who supports a child, manifests a continued interest in him, [and] is guilty of no serious misconduct * * *." Certainly the plaintiff in this case meets these criteria. It is conceded that his standing in his own community is good and that since the divorce the children's holidays from school, and summer vacations, have been spent with him at his Pennsylvania home or his summer place in Atlantic City. So far as support is concerned, he has been more than generous. Having voluntarily entered into a post-divorce agreement to pay $100 a month per child, plus medical expenses, he has not appealed a decree of the lower court raising this amount to $400 monthly for the children and granting the wife $4,000 for legal expenses in the custody suit. The father is a man of moderate means; his total income before taxes being $20,600 in 1967, $15,600 in 1968, and $25,600 in 1969.

---

3. There can be little doubt that this letter was transmitted to the wife, for her own trial lawyer in this case produced it when the first husband was on the stand.

4. At oral argument, appellee's counsel said that it was through his own inadvertence and not Pressman's that injunctive relief against use of the Nellis name was not included in the 1968 complaint. But as the suit was one for custody, such a request would have been surplusage.

The majority opinion also seems to ignore another "essential test going to the child's best interest" which was formulated in the *Kahn* case and summarized by the majority as follows:[5]

> Children ought not to have another name foisted upon them until they reach an age when they are capable of making an intelligent choice in the matter of a name.

This is precisely what happened to the children here as a result of the mother's actions when they were only age ten and five, respectively. The record makes it clear that it was the divorced wife, and not the children, who conceived and carried out the program for letting the children be known to their Washington acquaintances as Nellis rather than as Pressman, despite her denials on cross-examination that she had encouraged the children to use their stepfather's name.[6]

According to the son's testimony at the first hearing when he started to go to school in Washington (shortly after the mother's remarriage), his mother expressed resentment because schoolmates would call and say, "Mrs. Pressman, is Adam there?" She then suggested that he change his name to Adam Nellis,[7] thus avoiding the necessity of having to explain why his name and his mother's were different. Evidently the son was reluctant to go along, for he testified that the "first few times I said I didn't want to" and it was not until he "thought about it a long time" that he acquiesced.[8]

In effectuating the daughter Amy's change of name, the mother's approach was even more direct. Amy's first knowledge of the subject occurred when her teacher made such an announcement in the classroom of the school where Amy was a second grade pupil. She later learned that her mother had telephoned to say that she wanted her daughter's name changed.[9] Amy also testified that so far as she was personally concerned, the name by which she was called did not really matter.[10] Also illustrative of the mother's attitude with respect to allowing the children to maintain ties with the father is the fact that on the eve of this litigation, Amy had to "sneak out of the house" to post a letter to him.[11] On one occasion the mother attempted to find some pretext for cutting short the children's summer sojourn with him at Atlantic City, and on another occasion when the father was in Washington, she refused to let the children dine out with him.[12]

---

5. Mark v. Kahn, *supra* at 762.

6. The trial court also found that "she had caused the children to be enrolled in schools and camps and the son to receive his Bar Mitzvah in said surname". R. 356.

7. Excerpt from proceedings of June 25, 1970, 3–4.

8. *Id.* 20. Obviously the ante litem motam testimony of the children at the first trial where neither was on notice of the surname controversy is a vastly more trustworthy guide to the facts and their attitudes than their subsequent testimony.

9. *Id.* 43–44.

10. As Amy's subsequent view of the matter is referred to in the opinion, the following excerpt from the transcript of the first trial is revealing (*id.* 44–45):

> Q Let me ask you this, Amy. If you had your own way about it and didn't have to do what somebody else told you to do, would you rather use the name Pressman than the name Nellis?
> A I don't really know. I don't think it really matters, but I don't think my name was changed legally.
> Q You don't think it was changed legally?
> A I don't know, but I don't remember anything happening.
> Q So you feel that your name is really still Pressman no matter what somebody might call you; is that right?
> A Yes.
> Q You don't mind it being Pressman? You don't mind being known as Pressman rather than Nellis?
> A No, sir.

11. *Id.* 33–35, 53.

12. *Id.* 24–25, 46, 26–28, 39.

Such incidents not only suggest an explanation of why Amy's attitude toward continued use of the Nellis surname shifted between the first and second trials, but also support the soundness of the trial court in applying to this case the Massachusetts doctrine that the "bond between a father and his children in circumstances like the present is tenuous at best and if their name is changed that bond may be weakened if not destroyed".[13]

Moreover, some other aspects of the record persuade me that the trial judge's decision was correct. Disapproval of his decree places a premium upon the use of extra-legal methods with respect to name changes. For if the majority opinion is correct in stating that the name change of the children had already occurred (*i. e.*, from Pressman to Nellis) before the case reached the lower court, it also follows that the person responsible for this fait accompli—the mother—disregarded the only two methods prescribed by statute in this jurisdiction for acquiring a different surname.

One method would have been for the mother as "parent, guardian or next friend" to have filed an application in the Superior Court on behalf of the infants involved setting forth the reasons for the desired name change as provided in D.C.Code 1967, §§ 16–2501 to 16–2503 (Supp. IV, 1971). Another would have been for the stepfather, who is being held out in local circles as the natural father of the children, to have instituted adoption proceedings. D.C.Code 1967, § 16–301 ff., in which event the family name of the adoptees would have become that of the adopter under § 312(c) of that title.

If either legal course of action had been followed, the real father would have been entitled to appear in opposition to such petitions. Thus the prospect of judicial approval for either type of petition might well have been slim. This does not strike me, however, as justifying a party before us to reap the reward of conduct which flies in the face of public policy as set forth in acts of Congress.

Accordingly, I have some reservations about the majority insistence upon the total irrelevance to the issue of any consideration of which parent was at fault, although I agree with the view that in litigation of this sort, the welfare of the children is the paramount consideration. The written opinion of the trial judge, however, discloses that he was also guided by this very principle, for he expressly found that it was not necessary "for the best interest of the children" that they should be allowed a different surname.

Nevertheless, it must be remembered that the only litigants in this case are the divorced husband and wife—the children not being represented by a guardian ad litem or even a lawyer appointed to protect their interests.

So far as the impact of the lower court's decision upon the children's interest is concerned, it is apparent that the finding that Amy "would not be particularly disturbed should she be required to use her father's name" is fully supported by the record. It is true that the son, Adam, strong objects to the trial court's decree, but I am not persuaded that it is reversible error for a trial judge to reject the notion that the true interest of an adolescent of 15 is best served by letting him have his own way—particularly on an issue so important to proper filial attitudes as his present repudiation of the name of an affectionate father whose liberal financial support he seems quite willing to accept.

To be sure, his mother and the two professional witnesses retained by her predicted a calamitous effect on the boy unless the injunction were vacted, *viz.*, (1) that his relationship with his blood father would be jeopardized, and (2) that he would suffer a loss of identity which would cause him embarrassment among his contempo-

13. Mark v. Kahn, *supra* at 762.

raries. The sincerity of the first prediction—coming from the source it did—scarcely commands respect. Nor is the "identity" consideration a compelling one. It assumes that it is desirable to continue letting the boy live in a world of illusion rather than accepting the real fact of his heredity.