# District of Columbia
# Court of Appeals

No. 14-FM-1324

RENEE MONIQUE MELBOURNE,

                              Appellant,

         v.                                          **FSP-688-13**

MARCUS TAYLOR,

                              Appellee.


On Appeal from the Superior Court
of the District of Columbia


BEFORE:  GLICKMAN and FISHER, *Associate Judges*; and RUIZ, *Senior Judge*.

## J U D G M E N T

        This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel.  On consideration whereof, and for the reasons set forth in the opinion filed this date, it is now hereby

        ORDERED and ADJUDGED that the judgment of the Superior Court is reversed, and the case is remanded for further proceedings consistent with this opinion.


                              For the Court:


                              JULIO A. CASTILLO
                              Clerk of the Court


Dated:  November 3, 2016.

Opinion by Senior Judge Vanessa Ruiz.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-FM-1324

FILED 11/3/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

RENEE MONIQUE MELBOURNE, APPELLANT,

V.

MARCUS TAYLOR, APPELLEE.

Appeal from the Superior
Court of the District of Columbia
(FSP-688-13)

(Hon. Robert R. Rigsby, Trial Judge)

(Argued June 7, 2016                                   Decided November 3, 2016)

Renee Monique Melbourne, *pro se*.

*Alan B. Soschin* for appellee.

*Jonathan H. Levy*, with whom *Stephanie Troyer* and *Paul Perkins* were on the brief, for *amicus curiae* Legal Aid Society of the District of Columbia.

Before GLICKMAN and FISHER, *Associate Judges*, and RUIZ, *Senior Judge*.

RUIZ, *Senior Judge*: On October 7, 2013, appellant, Renee Monique Melbourne, filed with the Superior Court an application to change the last name of her minor daughter ("the child") from Taylor to Melbourne. The child's father, Marcus Taylor, opposed the name change. After hearing testimony from both

parents, the court denied appellant's application. On appeal, Ms. Melbourne argues that the trial court applied an improper standard when it denied the name change application. This is an issue we have not addressed since 1971. We agree with appellant, and reverse and remand the case to the trial court.

## I.

Ms. Melbourne and Mr. Taylor were married and living together in the District of Columbia when the child was born on May 11, 2012. A month later, the couple separated and Mr. Taylor moved to Florida to live with his parents but, in an attempt at reconciliation, Ms. Melbourne and the child soon moved to Florida to live with Mr. Taylor. The attempt at reconciliation failed, and Ms. Melbourne and the child moved back to the District of Columbia in September of 2012.

The next year, the couple was granted an absolute divorce on May 6, 2013. The court ordered joint legal custody of the child with Ms. Melbourne having primary physical custody, and Mr. Taylor awarded reasonable visitation. In a separate child support order, Mr. Taylor was ordered to pay $1,090.00 monthly, and to maintain health insurance for the child.

Following the divorce, Ms. Melbourne filed the name change application on October 7, 2013, and a trial was held on September 4, 2014. At trial, Ms. Melbourne testified that she wished to change her daughter's name due to having "difficulties [] establishing that [she is] the mother [of her] daughter." Ms. Melbourne recounted an instance when she had taken her daughter to temporary childcare for the day because her primary daycare provider was closed. Ms. Melbourne testified that a childcare worker must have assumed that Ms. Melbourne and her child shared a last name, and recorded Ms. Melbourne's name incorrectly, as "Taylor," on the pickup sheet. When Ms. Melbourne came to collect her daughter later that day, her identification showed a different name than that on the pickup sheet, and did not match the child's last name. She was initially prevented from leaving with her child. Eventually, after a director was called, "it all got straightened out," but it was a "process" that Ms. Melbourne wished to avoid in the future.

Ms. Melbourne also testified about another incident. While in the waiting room at the hospital where her daughter was having ear surgery, a hospital staff person called out to have "Ms. Taylor" come back to see the child, and another woman (presumably, named Ms. Taylor) was taken to see Ms. Melbourne's daughter. In a nutshell, Ms. Melbourne testified that she wished to change the

child's last name to hers in order to avoid what had been a recurring problem where someone assumed, incorrectly, that she and the child had the same last name and she was temporarily hindered as the custodial parent. Ms. Melbourne explained that her motive in wanting to have the child's last name changed was to end those problems, not to cause an estrangement between the child and her father. She commented, however, that Mr. Taylor had not manifested a continuing interest in the child, stating that Mr. Taylor had not called, emailed, or contacted her in any other way in order to facilitate the father-child relationship over the preceding twelve months. She further testified that after she had applied for the name change, she received an email from Mr. Taylor in March 2014 in which he threatened to kill the child. Ms. Melbourne did not contact the police after receiving the threat because she thought he was only trying to scare her into dropping the name-change application and, in any event, he was in Florida and did not know where she and the child lived. He did, however, have her email address and telephone number.

Mr. Taylor testified that he opposed the name change because he and Ms. Melbourne agreed when the child was born that she would pick the child's first and middle names and the child would bear his last name. Mr. Taylor denied that he had sent the threatening email, and explained that he had not used the email

address from which it was sent since 2012. He testified that he had made an effort to stay in the child's life, but that his efforts had been thwarted by Ms. Melbourne. Mr. Taylor testified that he had made "four or five" attempts during the preceding year to exercise his visitation rights but that Ms. Melbourne always said that the dates did not work for her or the child's schedules. This included the week of the hearing, when he was in town, and Ms. Melbourne told him he could see the child only on the weekend, but he could not afford to stay that long. Mr. Taylor said that if the child's name were changed he would not treat his daughter any differently. However, because he was being prevented from seeing the child, he thought their relationship would be diminished as he believed the only reason the child "knows who [he is] is because she [has his] last name."

After hearing testimony from both parties, the trial court issued a written order denying Ms. Melbourne's name-change application "in consideration of the best interest of the child pursuant to D.C. Code § 16-831 *et seq*." In order to determine the best interests of the child the court set out four factors which it cited as originating in *Nellis v. Pressman*, 282 A.2d 539, 542 (D.C. 1971), and addressed each factor in turn:

(1) [c]hildren ought not to have another name foisted upon them until they reach an age when they are capable of making an intelligent choice in the matter of a name; (2) [t]he bond between a divorced father and his children is tenuous at best and if their name is changed the bond may be weakened if not destroyed; and the name under which a child is registered in school goes far to effect a name change; (3) [w]hen a father supports a child, manifests a continuing interest in him, is guilty of no serious misconduct and without unreasonable delay, objects to an attempted change of name, the Court should decide the issue by determining what is for the child's best interest; and (4) [a] change of name may not be in the child's best interest if the effect of such change is to contribute to a further estrangement of the child from a father who exhibits a desire to preserve the parental relationship.

## II.

Applying these factors, the trial court found that: (1) as the child was then only two years old, her name should not be changed because she is unable to make an intelligent choice on the matter; (2) the father's physical absence from the child's life for more than a year — whatever the reason — meant that a name change "would weaken — and likely destroy — the bond" between the child and Mr. Taylor; (3) the father is current in his child support obligations, has demonstrated a continuing interest in the child, has not engaged in any

misconduct,[1] and filed a timely objection to the name-change application; and (4) the father has a desire to preserve a parental relationship with the child, but in light of the acrimony between the parents, a name change would "further estrange the relationship."

Ms. Melbourne argues that the judgment of the trial court must be reversed because the standard applied was erroneous. The appropriateness of the legal standard applied by the trial court is ordinarily reviewed de novo by this court. *See In re T.H.*, 898 A.2d 908, 911 (D.C. 2006). However, Mr. Taylor argues that because Ms. Melbourne did not object to the factors that the trial court previewed before trial and applied at trial, she waived her ability to raise the issue on appeal.[2] We agree that Ms. Melbourne failed to preserve her claim of error below, but that does not mean that Ms. Melbourne, who was proceeding *pro se*, affirmatively agreed with the legal standard the court informed the parties it would apply such that no appellate review can be had. We do not easily impute affirmative waiver and are especially loath to do so when substantive rights of a child are at stake.

---

[1] The trial court credited Mr. Taylor's testimony concerning the threatening email.

[2] In fact, the waiver argument is the only argument that Mr. Taylor makes on appeal. He does not argue the merits of the order, and agrees that if the court applied the incorrect standard, remand for a new trial is necessary.

Instead, we review the claim on appeal for plain error. *See In re D.B.*, 947 A.2d 443, 450 (D.C. 2008). "On a plain error review, an appellant must demonstrate that the objectionable action was (1) error, (2) that [was] plain, (3) that affect[ed] substantial rights, and (4) the error seriously affect[ed] the fairness, integrity, or public reputation of the judicial proceedings." *Juvenalis v. District of Columbia*, 955 A.2d 187, 192 (D.C. 2008) (internal quotation marks omitted).

We conclude that the high bar erected by plain error review is met in this case. First, application of the factors which the court cited as originating in *Nellis*, was legal error. The factors applied by the trial court were not established in *Nellis*, but were from a 1956 Massachusetts case, *Mark v. Kahn*, 131 N.E.2d 758 (Mass. 1956). While this court in *Nellis* mentioned the *Mark* factors, as well as factors from another non-precedential case, it did not apply them. In fact, although in *Nellis* the court initially expressed it had "no problem" with two factors, ultimately we explicitly rejected them, stating "[w]e do not consider *Mark* and *Ouellette* as being worthy of the weight apparently given them by the trial court." *Nellis*, 282 A.2d at 543-44.[3]

---

[3] In *Nellis*, after the parents were divorced and the mother remarried and changed her name, she changed the children's last name from their biological father's name, Pressman, to that of their stepfather, Nellis, without seeking a court

(continued . . .)

Not only were the *Mark* factors not applied in *Nellis*, they also contain doubtful premises that this court should not accept or perpetuate. For example, the notion that "the bond between a divorced father and his children is tenuous at best and if their name is changed the bond may be weakened if not destroyed" is itself tenuous at best. As a general proposition, divorced fathers, as well as mothers, may have primary physical custody, or even exclusive legal custody of their

———————————————

(. . . continued)

order or the biological father's consent. The biological father then sought a court order changing their name back to Pressman. The trial court granted an injunction to the father, and this court reversed. The factors relied on by this court in *Nellis* were:

> (a) the children have been known in this community for more than five years as Nellis and had a good relationship with their father during those years, (b) their name and identity as Nellis have become imbedded in their own minds as well, (c) the likely impact on their lives of changing back again after all these years to the name Pressman, (d) the children's views are entitled to serious consideration because of their ages and level of intelligence, (e) the reality that the son is approaching the age (18) when he will be eligible to vote and, if necessary, serve in the armed forces and is therefore not far from the time when his wishes on his name would be difficult to deny, (f) the effect the injunction has already had in their lives and on the relationship with their father, and (g) the father's physical remoteness from the community where the children reside.

282 A.2d at 544-45.

children.  Some parents never marry, so divorce is not an issue with respect to their ability to maintain strong connections with their children.  Some parents are same-sex couples and the gender distinction is inapt.  Some children are born into families where the custom is for children's surnames to incorporate both the father's and the mother's last names, as is often the case for persons of Latin American or Spanish heritage.  In other words, there is no one-size-fits-all resolution.

Moreover, the notion that the father's bond with his daughter would be weakened if she did not have his last name finds no support in the evidence in this case.  Here, even though Mr. Taylor is not the parent with primary custody, he testified that his love for and treatment of his daughter would "definitely not" be altered if her last name were to be changed.  His concern that the child would not know he is her father if she used her mother's name may be sincere, but there was no evidence to support that concern.  More compelling factors in ensuring his parental relationship with a young child would be his continuing presence in her life through visits and other communications that express his interest and affection, as well as compliance with child support obligations.[4]

---

[4] Counsel explored these issues, asking whether Mr. Taylor had visited his daughter, sent her birthday cards or presents, or inquired of her daycare providers

(continued . . .)

In addition to their doubtful factual premises, the *Mark* factors perpetuate gender-based distinctions that have come under increasing judicial scrutiny since *Mark* was decided over half a century ago.[5]  These distinctions are based on stereotypes about the relationship between fathers and their children and do not take into account (or even mention) how a name change might affect the bond between mother and child.  As they are based largely on gender stereotypes, and not grounded on the best interests of the child, these distinctions raise significant constitutional issues[6] and are contrary to the law of the District of Columbia.  *See*

_____

(. . . continued)
about her social or educational development.  Mr. Taylor responded that he had not, but had gone through counsel to arrange for visitation and to find out about her daycare placement.  He testified he was current with child support payments.

[5]  Post-*Mark*, the courts in Massachusetts, as elsewhere, have moved away from presumptions in favor of the paternal surname, in favor of "a principle of equality" that "the right of the father to have the child bear his name is no greater than that of the mother to have the child bear her name."  *Jones v. Roe*, 604 N.E.2d 45, 47 (Mass. App. Ct. 1992) (citing cases and setting out several child-centered factors that should guide court's determination).

[6]  "Gender-based distinctions 'must serve important governmental objectives and must be substantially related to achievement of those objectives' in order to withstand judicial scrutiny under the Equal Protection Clause."  *See Caban v. Mohammed*, 441 U.S. 380, 388 (1979) (quoting *Craig v. Boren*, 429 U.S. 190, 197 (1976)); *see id.* at 391-92, 394 (holding that statutory provision that distinguished between unwed fathers and mothers, and gave only mothers right to veto adoption of child, bore no substantial relation to important state interest in providing adoptive parents to "illegitimate" child, and violated the Equal Protection Clause (citing *Reed*, 404 U.S. at 76)).  It is the view of the author of this opinion that factors which express a generalized preference for the father's wishes concerning a
(continued . . .)

*Reed v. Reed*, 404 U.S. 71, 76-77 (1971) (holding, in context of probate law favoring fathers, that the Equal Protection Clause applies to gender classifications and does not allow a legal preference for one gender "solely on the basis of sex"); *Lehr v. Robertson*, 463 U.S. 248, 266 (1983) (noting that government "may not subject men and women to disparate treatment when there is no substantial relation between the disparity and an important state purpose"); *W.M. v. D.S.C.*, 591 A.2d 837, 843 (D.C. 1991) ("The fortuity of gender cannot determine the extent of a parent's obligation to his or her child."); D.C. Code § 16-914 (a)(1)(A) (providing that sex of parent "in and of itself, shall not be a conclusive consideration" in court's determination as to the legal and physical custody of a child).

Second, the error was plain. "In order to determine whether the error was plain, the error must have been obvious or readily apparent, and clear. This requires a determination of whether the claimed error was clearly at odds with established and settled law." *Juvenalis*, 955 A.2d at 194-95 (citations omitted). It is clear that this court did not adopt the *Mark* factors in *Nellis*. It is also clear that

_____

(. . . continued)
name change do not bear substantially on the state's interest in promoting the welfare of the child and thus do not withstand judicial scrutiny under the Equal Protection Clause.

factors applied by the trial court included gender-based stereotypes that could not serve as a substitute for a determination of the best interests of a child.

Third, the error affected substantial rights. An appellant must show "a reasonable probability [that] the errors had a prejudicial effect on the outcome of his trial." *Juvenalis*, 955 A.2d at 195. As the trial court based its ruling solely on the erroneous factors, there is no doubt that they affected the outcome.

Finally, "a new trial is warranted when the error was so clearly prejudicial to an appellant's substantial rights as to jeopardize the very fairness and integrity of the trial." *Id.* Application of gender-based factors that are not geared to the best interests of the child and are contrary to the law of the District of Columbia and constitutionally suspect, jeopardizes the fairness, integrity, and public reputation of the court's proceedings.

Mr. Taylor concedes that if this court finds that the wrong standard was applied, remand for a new trial is necessary. We agree. Prior to trial, the court informed the parties of the factors that it would be applying (the *Mark* factors), with the result that their evidence and arguments were aimed at meeting that erroneous standard. Therefore, we reverse and remand the case to the Superior

Court for further development of the record geared to the court's consideration of the proper relevant factors.

On remand the party requesting the name change has the burden of proof to show by a preponderance of the evidence, *see In re E.D.R.*, 722 A.2d 1156, 1159 (D.C. 2001) (noting that civil cases generally require proof by preponderance of the evidence and impose burden on party seeking relief), that the touchstone standard — the best interests of the minor child — is met. *See In re S.C.M.*, 653 A.2d 398, 405 (D.C. 1995) ("[I]n all proceedings affecting the future of a minor, the decisive consideration is the best interests of the child."). The court's determination whether a name change is in the best interests of the child should not be based on general presumptions or stereotypes but on individualized determinations that are gender-neutral, family-specific and, above all, child-centered.[7] As we stated in *Nellis*, proper factors to be considered include but are

---

[7] Many best interests of the child determinations in the District of Columbia are guided by a variety of statutory factors. *See, e.g.*, D.C. Code § 16-831.08 (third-party custody of child); *id*. at § 16-914 (a)(3) (parental custody); *id*. at § 16-2353 (b) (termination of parental rights). There is no similar statute mandating factors that must be considered in the context of a minor's name change, but as *Nellis* shows, a number of factors may be relevant, as dictated by the facts specific to the child and his or her family. *See also* D.C. Code § 7-205 (e)(5) (2012 Repl.) (providing that, at birth, "[t]he surname of the child shall be the surname of a parent whose name appears on the child's birth certificate, or both surnames

(continued . . .)

not limited to: how long and how widely the child has been known by her current name, the extent to which the child's name has become embedded in the child's own mind and identity, and the view of the child (depending on the age of the child). 282 A.2d at 543-45; *see also* D.C. Code §§ 16-831.08 (a)(4), 16-914 (c)(3)(A), 16-2353 (b)(4) (2012 Repl.) (including the child's "opinion of his or her own best interest in the matter" and "the wishes of the child" as factors to be considered in determining third-party custody, parental custody, and termination of parental rights). Another factor critical to the child's best interest is how the proposed name change would affect the safety and well-being of the child, which may include consideration of parental misconduct (especially involving an intrafamily offense) or reputation but only to the extent that it might affect the child's safety or sense of self and well-being. *See* D.C. Code § 16-831.08 (b) (presumption that award of custody to third party who has committed intrafamily offense is not in best interest of child); *id.* at § 16-914 (a)(3)(F) (listing evidence of intrafamily offense as factor to be considered in determining parental custody).

For the foregoing reasons, we reverse and remand for further proceedings

---

(. . . continued)
recorded in any order or in hyphenated or unhyphenated form, or any surname to which either parent has a familial connection").

consistent with this opinion.

*So ordered.*