*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 23-AA-0363, 23-AA-0384, 23-AA-0385, 23-AA-0711 & 23-AA-0735

DISTRICT OF COLUMBIA DEPARTMENT OF HUMAN SERVICES, PETITIONER,

V.

ANGELA BUTLER, *et al.*, RESPONDENTS.

On Petitions for Review of Orders of the District of Columbia
Office of Administrative Hearings
(2022-DHS-00974, 2023-DHS-00582, 2023-DHS-00196 & 2023-DHS-00112)

(Argued May 23, 2024                                     Decided May 22, 2025)

*Jeremy R. Girton*, Assistant Attorney General, with whom *Brian L. Schwalb*, Attorney General, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Graham E. Phillips*, Deputy Solicitor General, were on the briefs, for petitioner.

*Jonathan H. Levy*, with whom *Alec Sandler* and *Rebecca Steele* were on the brief, for respondents.

Before DEAHL and HOWARD, *Associate Judges*, and THOMPSON, *Senior Judge*.

Opinion for the court by *Senior Judge* THOMPSON.

Dissenting opinion by *Associate Judge* DEAHL at page 44.

THOMPSON, *Senior Judge*: These consolidated petitions arise out of hearing requests by five individuals who encountered lengthy delays in obtaining food assistance (either Supplemental Nutrition Assistance Program ("SNAP") or

Pandemic Electronic Benefit Transfer ("P-EBT") benefits), Temporary Assistance to Needy Families ("TANF"), or Medicaid benefits to which they or their children were entitled. In each case, the individual requested a hearing before an Administrative Law Judge (ALJ) in the Office of Administrative Hearings (OAH). The ALJs, after multiple status hearings and a series of claimant-specific orders—that were amply justified given the delays that had ensued, and that are not challenged here—directed the District of Columbia Department of Human Services (DHS) to provide correct benefits to the claimants (and each ALJ eventually found that the delayed benefits had been provided). However, in each case, the ALJs also issued an order or series of orders requiring DHS to correct an "unlawful policy." The orders that are the subject of these consolidated petitions for review (which we refer to hereafter as the "challenged order(s)" or the "purported policy-correction orders") are as follows:

In the case of respondent Butler, the ALJ issued a March 30, 2023, order directing "that DHS SHALL CORRECT its policy of illegally delaying public benefits recipients from receiving their benefits due to a faulty computer program by April 6, 2023." In the case of respondent Hill, the ALJ signed an April 7, 2023, order directing "that DHS SHALL correct its unlawful policy of withholding

benefits to which beneficiaries are legally entitled based on an internal computer error by April 12, 2023" (the "April 7 order").[1]  And in the consolidated cases of respondents Harrison, Ebron, and Gans, the ALJ issued an April 7, 2023, order, date-stamped April 10, 2023, directing "that DHS SHALL correct its illegal policy of delaying legally eligible public benefits recipients from receiving their benefits because of a faulty computer program by April 18, 2023" (the "April 10 order").

DHS—petitioner in the instant matter in which we have consolidated all the foregoing cases—seeks reversal of the purported policy-correction orders, contending that they are "factually unsupported, arbitrary, and legally erroneous."[2] Because there was a lack of probative evidence of an "internal computer error" or "faulty computer program" that amounted to a "policy" in derogation of law, and because there was no demonstrated need for systemic injunctive relief, we vacate the challenged orders.

---

[1] This order is date-stamped April 10, 2023, but we refer to it as the "April 7 order" to distinguish it from the order issued in the Harrison/Ebron/Gans cases, also signed on April 7 and bearing a date-stamp of April 10, 2023.

[2] In cases 23-AA-711 (Butler) and 23-AA-735 (Hill), DHS has also petitioned for review of the OAH case-closing orders.

## I.    The Authority of OAH

As an administrative tribunal, OAH does "not have the inherent 'equitable authority' of courts in the judicial branch." *Coe v. D.C. DHS*, 281 A.3d 603, 607 (D.C. 2022) (quoting *D.C. Off. of Tax & Revenue v. Shuman*, 82 A.3d 58, 70 (D.C. 2013)).  However, OAH can order individual relief for claimants and, as noted, it did so in each of these consolidated cases, requiring DHS, by a specified deadline, to pay or otherwise afford outstanding benefits or make retroactive payments of benefits owed to beneficiaries for past periods.[3]  *See* D.C. Code § 2-1831.09(b)(5) (authorizing OAH ALJs to "[i]ssue interlocutory orders and orders").  OAH can also (and did) sanction DHS for failure to meet the deadlines its orders imposed.[4]  *See*

---

[3] *See, e.g.*, the March 21, 2023, order directing that DHS "shall correct Petitioner[] [Butler's] [SNAP and P-EBT] cases by 5:00 on March 28, 2023"; the March 23, 2023 order to pay Ms. Hill "$1334 in missing benefits" by March 31; the March 3, 2023, order requiring DHS to "IMMEDIATELY" issue correct SNAP and TANF benefit amount to Ms. Harrison and to "IMMEDIATELY" activate Mr. Ebron's Medicaid card retroactive to August 2022;  the April 10, 2023, order directing that DHS "SHALL timely issue correct SNAP and TANF monthly benefit amounts . . . for [Ms. Gans] IMMEDIATELY."

[4] For example, the ALJ in the Harrison/Ebron/Gans case required DHS "to pay $3,000 in sanctions for its failure to provide correct SNAP and TANF benefits to [Ms. Gans] for the 14 months since her daughter . . . was born[.]"

D.C. Code § 2-1831.09(b)(8) (authorizing OAH ALJs to "[i]mpose monetary sanctions for failure to comply with a lawful order or lawful interlocutory order").

In addition, OAH ALJs are not "bar[red] . . . from imposing declaratory or injunctive relief in all circumstances." *Coe*, 281 A.3d at 607. D.C. Code § 4-210.16(b) provides that

> Whenever a claimant challenges a departmental policy or the administrative construction or interpretation of relevant statutes, regulations, orders, or departmental directives, and his or her claim for relief is granted by the hearing officer and the Mayor's agent because of a misapplication of law contained in the policy, construction or interpretation, the Mayor will correct the challenged policy, construction or interpretation.

This court held in *Coe* that "[t]he language 'the Mayor will' in [Section 4-210.16(b))] authorizes an ALJ to order the mayor to correct an unlawful policy," 281 A.3d at 608, as long as the ALJ "operate[s] within the bounds prescribed by statute," *id.* at 607. This means, to track the statutory language, that an ALJ's authority to order the correction of an unlawful DHS policy is limited to circumstances in which the claimant before OAH (1) "challenges a departmental policy or the administrative construction or interpretation of relevant statutes, regulations, orders, or departmental directives"; (2) the petitioner's claim for relief

is granted; and (3) the relief is based on "misapplication of law contained in the policy, construction or interpretation." D.C. Code § 4-210.16(b). That said, "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course" or if a "less drastic remedy" is "sufficient to redress" the injury. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). To say that an ALJ had authority to issue an order pursuant to Section 4-210.16(b) is not to say that it was appropriate to do so. *See Coe*, 281 A.3d at 608. An ALJ must still consider whether an order directing correction of "policy" is warranted—i.e., whether the unlawful policy still exists and the order is "still necessary." *Id*.

## II. Factual Background

The following is a summary of the salient facts of the records in the cases that are before the court.

Respondent Butler: In October 2022, Ms. Butler sought an OAH hearing because she had never received Summer 2022 "P-EBT" benefits for her three children.[5] On March 29, 2023, John Murphy, the DHS policy analyst who attended

---

[5] Ms. Butler also sought relief because her recertification for SNAP benefits was delayed, with the result that her SNAP benefits had been terminated as from July 2022. By March 29, 2023—i.e., before the challenged March 30, 2023,

the OAH status hearings in Ms. Butler's case, explained to the ALJ that there was some "confusion" regarding the start and end date for the P-EBT benefits,[6] as well as "another IT ticket" (during a March 21 status hearing, Mr. Murphy had also reported an "IT problem" awaiting its turn for resolution) that might have "adversely influenced things."[7] Mr. Murphy additionally attributed the "difficulties" to the fact (as he understood it) that the Office of the State Superintendent of Education ("OSSE") was the source of P-EBT funding.[8]  As the ALJ later summarized, Mr. Murphy's point was that OSSE was "responsible for releasing [P-EBT] funds" and was "a necessary party to the resolution of [Ms. Butler's] P-EBT matter."  In short, the representations on the record were that the delay in paying P-EBT benefits to Ms. Butler was related to "confusion" and to a "roadblock" between DHS and

purported policy-correction order was issued in her case—she had already received several months of retroactive SNAP payments.

[6] The ALJ "credit[ed]" (though did "not excuse") Mr. Murphy's representation that confusion existed.

[7] The DHS representative in Ms. Hill's case explained that if a DHS worker is unable to process a case because of a "computer glitch," the worker seeks help from the DHS IT team, which sometimes is able to correct the problem and, if not, refers the issue to "the [outside] contract team, . . . who created the . . . ticket system" and who then work to "fix technical problems."

[8] P-EBT funds were a replacement for school meals that were unavailable during the pandemic-period school closures.  OSSE represented in a later filing with OAH that it had "no direct involvement in the decision-making process or the disbursement of benefits under the P-EBT program."

OSSE, along with the impact of problems requiring "IT tickets" to correct. Nevertheless, on March 30, 2023, the ALJ acceded to Ms. Butler's request and issued an order directing DHS to correct a putative "unlawful policy of . . . [with]holding benefits . . . based on internal computer errors, rather than issuing these benefits manually." (The order was never rescinded even though Mr. Murphy referred, during a June 20, 2023, hearing, to a notice stating that "P-EBT payments are extremely manual.") And although the ALJ had noted in the challenged March 30 order that he found the DHS representatives' belated statements about OSSE's contribution to the delay "unpersuasive," he stated in his July 28 order closing the case that "it would appear that OSSE and DHS resolved [any] roadblocks" that had "prevent[ed] DHS from issuing [Butler's] outstanding [P-EBT] payment[.]")

Respondent Hill: In February 2023, Ms. Hill sought a hearing to challenge the erroneous termination of her SNAP benefits in December 2022 that had resulted in underpayments for January, February, and March 2023. During a status hearing on March 1, 2023, DHS policy analyst Nelson Manga explained that he saw a note about a "computer mix-up" in Ms. Hill's case (one that, as Ms. Hill described its effect, caused another beneficiary's name to come up when Ms. Hill's case number

was typed in). At a status hearing on March 23, 2023, Mr. Manga reported that Ms. Hill's payment for January had been issued and received by Ms. Hill, but that a DHS worker who tried to initiate a payment for February had encountered difficulties and "could not do it." An IT "ticket" had been issued to try to resolve the problem, and Mr. Manga was still waiting for information. There was also a March underpayment that Mr. Manga believed "was missed by the agency worker," which Mr. Manga said he would bring to the worker's attention. Ms. Hill's counsel acknowledged that "DHS can and has manually paid benefits to people when they were due."[9] During a status hearing on April 6, 2023, Mr. Manga reported that DHS was "still working on the case" and predicted that the payments could be made by "the end of the day" or the next day—a prediction that was proven accurate: the record contains a set of April 6, 2023, letters stating that the amounts owed for February and March, totaling $1,334, had been paid. Thus, as of April 6, 2023, DHS—having been ordered by OAH to act by April 12, 2023, under penalty of

---

[9] Mr. Manga noted during a May 8, 2023, proceeding that manual issuance of benefits sometimes does not work because the "system won't let them do that" if "there's a technical issue in the case." Ms. Hill's counsel acknowledged on the record that "it sounds like there's also an issue sometimes with manually issuing benefits."

sanctions if it did not do so—had restored Ms. Hill's SNAP benefits to the proper monthly allotment and paid her all of the SNAP underpayments that were owed to her.

Nevertheless, on April 7, 2023, the ALJ signed the order directing that "DHS shall correct its unlawful policy of withholding benefits to which beneficiaries are legally entitled based on an internal computer error by April 12, 2023" (appearing to accept the rationale later articulated by Ms. Hill's counsel that "the unlawful policy is the withholding of benefits for relying on the computer problems solely"). The ALJ did so even though Mr. Manga had attributed the payment delay in part to error by an agency worker, had assured the ALJ that the agency was actively working on issuing a payment, and said that he expected the payment to be issued that day or the next day, and even though counsel for Ms. Hill had acknowledged that DHS's practice sometimes included manually issuing payments.

Respondent Harrison: Ms. Harrison sought an OAH hearing after her TANF and SNAP payments were improperly reduced because DHS had relied on incorrect earned-income and child-support income information that remained in its database

despite updated information Ms. Harrison had reported months earlier.[10] During OAH status hearings on February 9 and 16, 2023, DHS policy analyst Manga explained that DHS staff had encountered some "technical difficulties" in "tak[ing] out" the earned income and child support Ms. Harrison was no longer receiving. Mr. Manga further explained that the agency had "issued out a ticket" and was asking for expedited resolution, but the ticket had not yet been resolved. On March 2, Mr. Manga reported that the incorrect income information had been removed from Ms. Harrison's account. After Ms. Harrison's counsel then objected that DHS had failed to update its system with Ms. Harrison's increased shelter (rent) expense, DHS made that correction, so that by March 9, 2023, Ms. Harrison had received all outstanding reimbursements as well as notices of her correct benefit amounts

---

[10] The record also shows that there had been a delay in processing Ms. Harrison's recertification, resulting in issuance of erroneous notices that her benefits would be terminated at the end of 2022. This occurred after she submitted a "Change of Circumstances" form that a DHS case reviewer observed (after an Administrative Review Conference) had been submitted "for . . . [m]edical benefits only." By January 5, 2023, DHS had acknowledged the errors, with the case reviewer's letter referring to a "system glitch" that had "prevented the worker from being [able] to process [Ms. Harrison's] recertification applications timely." By the date of Ms. Harrison's initial OAH hearing on January 11, 2023, her ongoing SNAP and TANF benefits had already been restored, an underpayment amount for October 2022 to January 2023 had been issued, and there was also an overpayment in connection with a payment Ms. Harrison had received in January.

moving forward. Thus, a month before OAH issued the challenged, April 10 putative policy-correction order, DHS had already corrected the benefit-reductions about which Ms. Harrison had complained and already paid her the underpayment amounts she was owed. As her counsel put it on March 31, the "glitch in her case was resolved."

Respondent Ebron: At the time of Mr. Ebron's initial OAH status hearing on June 28, 2022, he had been waiting months for a Medicaid card, having newly applied for coverage in January 2022. He was over-income for "straight" Medicaid, but DHS representative Lakia Powell told the ALJ that Mr. Ebron would be "eligible for the [Qualified Medicare Beneficiary ("QMB")] program and spend down."[11]

---

[11] Per the D.C. Department of Health Care Finance ("DHCF") website, the District of Columbia "Qualified Medicare Beneficiary (QMB) program helps District residents who are eligible for Medicare pay for their Medicare costs. This means that Medicaid will pay for the Medicare premiums, co-insurance and deductibles for Medicare covered services." *See Full Duals and Qualified Medicare Beneficiary (QMB) Only*, Department of Health Care Finance—DHCF, https://dhcf.dc.gov/service/qualified-Medicare-beneficiary-qmb; https://perma.cc/VR3U-38RG (last visited February 18, 2025). An informational bulletin available on the Department of Health and Human Services' website states that "QMBs are persons who are entitled to Medicare Part A and are eligible for Medicare Part B; have incomes below 100 percent of the Federal Poverty Level; and have been determined to be eligible for QMB status by their State Medicaid Agency." Melanie Bella & Cindy Mann, *Billing for Services Provided to Qualified Medicare Beneficiaries (QMBs)* 1 (Jan. 6, 2012), https://www.medicaid.gov/Federal-Policy-Guidance/downloads/CIB-01-06-12.pdf;

However, DHS staff had encountered "technical difficulties" or a "computer technical issue" getting his case into active status. Ms. Powell stated that staff were "working on it" but had been dealing with an issue "since 2016 with our [computer] system."

By the date of a September 6, 2022, OAH hearing, DHS reported that it had processed Mr. Ebron's application and had transmitted information to the Social

---

https://perma.cc/JW7A-BEJD  A factsheet available on the DHCF website instructs claimants that "[s]ome over income people may qualify for Medicaid if they spend the excess income on medical bills.  This is called a spend down. . . .  Spend down works like an insurance policy deductible.  The amount of the 'deductible' is called the 'spenddown amount.'  When you have collected medical bills (paid or unpaid) greater than your excess income, you will get Medicaid for that month you met your spend down amount through the end of your spend down budget period.  You are responsible for the bills up to the excess amount.  Medicaid will only pay those bills over your spend down amount."  Dep't of Health Care Fin., *Frequently Asked Questions: Spend Down* 1, https://dhcf.dc.gov/sites/default/files/u23/Final%203-15-17%20Spenddown%20FAQ%20Fact%20Sheet.pdf; https://dhcf.dc.gov/sites/default/files/u23/Final%203-15-17%20Spenddown%20FAQ%20Fact%20Sheet.pdf (last visited February 18, 2025).

The DHCF website further advises that for a claimant to use old, paid or unpaid medical bills toward spend down, "[t]he date on the bill must be within the last 90 days from the date you applied for Medicaid" or the bill must have been paid "while you are on your spend down budget period."  *Id.* at 3.  Regarding the spend-down budget period, the website advises, "[i]f you meet your spend down amount within your spend down budget period when you first apply for Medicaid, you will get a second spend down budget period without submitting a new application. . . .  If you do not meet your spend down amount [during the first budget period], you will need to submit a new application."  *Id.* at 2.

Security Administration (SSA) for that agency to cease deducting Medicare premiums from Mr. Ebron's Social Security checks and to "send the back benefits." By October 4, 2022, Mr. Ebron had received his QMB card and, by October 24, 2022, after a DHS office move that slowed down work on his application, he was found eligible for spend-down benefits for May through July 2022. He was to submit additional bills going forward.

By the date of a February 23, 2023, status hearing, Mr. Ebron's representative reported that some of his medical bills had not been paid and had gone to a collection agency. DHS representative Catrice Simpson, who was detailed to DHCF, explained that the agency had switched to a new computer system, that Mr. Ebron's was one of the first spend-down cases that the agency was trying to process with the new system, and that because of how the new "policy-driven" system was programmed, it would not recognize expenses incurred after "the spend-down period was closed" and was "telling [staff] that a new application was needed." Agency staff were working with the technical support people to see what else could be done, but Ms. Simpson suggested the problem could be solved by Mr. Ebron submitting a new application, which the ALJ noted Mr. Ebron would "have to file . . . regardless" because of the requirement of recertification. Ms. Simpson also reminded

Mr. Ebron that not every bill he had submitted would be eligible for payment because some (she mentioned bills from 2021) were too dated. Thus, without exploring whether Mr. Ebron's bills that had gone to collection were actually eligible for reimbursement under the "complex"[12] QMB program, without waiting to see whether Mr. Ebron's submission of a new application would solve the problem, and without affording time for DHS to fully phase in its new system, the ALJ declared that because "a computer" was responsible for the delays about which Mr. Ebron complained, "this is a policy problem," which she was inclined to address by issuing an order requiring DHS to "change its policy and do something that doesn't involve this dysfunctional computer system and get Mr. Ebron his benefits."

By the time the ALJ issued the challenged April 10 order, Mr. Ebron's counsel reported that he "ha[d] what he needs."

Respondent Gans: Ms. Gans sought an OAH hearing after she gave birth to a daughter in April 2022. Although she had submitted paperwork to DHS to document the birth, the child was not added to her account so as to increase her monthly SNAP and TANF benefit amounts. At Ms. Gans's initial hearing before OAH on February

---

[12] *Rehab. Ass'n v. Kozlowski*, 42 F.3d 1444, 1458 (4th Cir. 1994).

15, 2023, DHS policy analyst Murphy reported that he had researched the agency's document-imaging system and had found there much of the needed documentation, was not sure whether anything additional was needed, but would ask agency staff to review the documents, request any additional needed information, and correct the problem. Mr. Murphy did not describe a computer problem. At a status hearing on March 21, 2023, Mr. Murphy acknowledged that DHS had not acted on his request, but again he did not attribute the delay to a computer problem. Mr. Murphy acknowledged during a March 31, 2023, status hearing that the additional benefits still had not been paid despite his requests, but once again did not describe a computer problem. Nevertheless, the ALJ commented during that hearing that "we've got a group of now four different DHS benefits people [as to whom] DHS has said, yes, these folks are legally entitled to get their benefits, but the computer won't give them out correctly."[13]

---

[13] The record indicates that the "four[th]" person was a beneficiary referred to as "L.P.," in whose case a DHS hearing examiner had "made a mathematical error when calculating her SNAP underpayment." That is, contrary to the ALJ's assumption, the problem apparently was not that "the computer" would not give out benefits correctly. Hearing that the mathematical error had been corrected and L.P. had been paid, the ALJ said that she would dismiss L.P.'s case.

By April 18, 2023, Ms. Gans's household information had been adjusted for May 2023 onwards, but she still had not received back TANF benefits. Mr. Murphy acknowledged that the agency was still working on the TANF benefits (but said that he was "not aware" of any agency policy to "withhold benefits while . . . system glitches are impacting cases"). Ms. Gans's counsel stated her suspicion that Ms. Gans's shelter costs had not been taken into account in determining the amount of the SNAP underpayment that was issued and asserted that Ms. Gans's case "is still being impacted by the tech glitch," though Mr. Murphy had not mentioned a computer glitch or (as the ALJ put it in her challenged order) a "faulty computer program."

During a May 9 status hearing, Mr. Murphy did report a computer-related problem, telling the ALJ that the system "would not generate [an unspecified] underpayment," so staff "would have to go back through and make manual payments." But by a May 30 hearing, both the SNAP and TANF underpayment amounts had been paid, and Ms. Gans's counsel had no concerns regarding TANF payments going forward. However, counsel was concerned that the forthcoming SNAP payment would not reflect Ms. Gans's rent expense. Mr. Murphy posited that what might cause Ms. Gans's benefit amount to be reduced was a known problem

that sometimes "when [the system] . . . runs through the calculation, . . . the rent drops out" and might be "overlook[ed]" by a worker who does not "take[a] a deep dive into the system[.]"  He said he could ask the DHS staff who were instrumental in getting the corrections made to "run it through again so that the rent picks up and then the correct amount is issued."  The ALJ commented on the need to get someone in who could "explain what the IT problem is."  Mr. Murphy, who explained that IT matters were not within "the scope of [his] duties," stated that he did not know who would be the appropriate person to explain.

At a June 27, 2023, status hearing, a DHS Program Director, Tamika Fitzgerald, told the ALJ that DHS had conducted a system analysis and "determined there was no system error or glitch as it was characterized" but instead "a processing error on the part of the caseworker," who "did not follow business processing rules, which resulted in the general communication not being sent to [Ms. Gans] to complete the verification process to give her credit for the shelter expenses."  Ms. Fitzgerald explained that "[t]his process has to be initiated by the caseworker . . . before the system can take the information and generate the payment."  She explained that household-size information likewise "has to be activated and entered by the caseworker."  The ALJ said that she "had been told

these were computer problems," but acknowledged that she had not "actually been told what the problem was." While Ms. Fitzgerald's (uncontested) representations were not before the ALJ before she issued the challenged April 10 order, they underscore that the ALJ drew her conclusion about a "faulty computer program" without requiring competent evidence about what had caused the underpayments to Ms. Gans.

### III.   *Coe* and the Parties' Arguments

DHS argues that these cases did not present circumstances that satisfy the requirements of Section 4-210.16(b) as elucidated in *Coe*.

In *Coe*, the administrative record made clear that what was involved in DHS's termination of the respondents' Medicaid benefits was a department policy that violated specific federal law. There, per Coe's briefing to OAH, an official in DHS's Division of Policy and Operations (an individual "well-versed in the agency's policies and procedures") had represented in an email to Coe's counsel that under DHS's then-current policy, a Medicaid beneficiary who had been receiving age- or disability-based benefits could be screened for income-based continued eligibility only by submitting a D.C. Health Link application *after* her age- or disability-based

Medicaid coverage had terminated.  Coe argued, DHS acknowledged in its response to Coe's motion for summary adjudication, and OAH essentially found, that DHS's failure to screen Medicaid beneficiaries for income-based Medicaid eligibility *before* terminating benefits resulted not from an isolated error but from the agency's standard practice, which had been developed in response to the logistical challenges associated with continuing to use the agency's legacy eligibility system that was not compatible with the then-new D.C. Health link system.[14]  DHS admitted to, and OAH referred to, an "unresolved technological problem with DHS's . . . eligibility determination system" that was "likely to affect other Medicaid beneficiaries while DHS works towards a long-term solution."

DHS acknowledged, and OAH further found, that DHS had built into its legacy Medicaid-eligibility determination system "a failsafe . . . that does not allow an [alternative-basis] eligibility determination to be made if [the system] identifies an active Medicaid case in the system of record."  The result, Coe showed, was a policy that "*inherently* prevents" consideration of alternative eligibility until regular

---

[14] DHS told OAH that DHCF was "already aware of the need for modification of the District's Medicaid recertification process for customers who may transition from [one basis for Medicaid-eligibility to another] and is actively working on . . . modifications to the process[,]" which would "take time to develop and implement."

Medicaid "ha[d] already expired, in direct contravention of the pre-termination review requirements of federal law." And, indeed, OAH found that DHS was "working on . . . modifications to the process" but in the meantime was continuing to issue termination notices without checking for eligibility on an alternative basis.

OAH reasoned that DHS could have responded to this problem by declining to issue the Medicaid-eligibility termination notice, and continuing to provide benefits, until it was able to make a targeted request for the information needed to determine income-based eligibility and perform the legally required eligibility determination through manual processing or some other method, but instead "chose to issue a notice of termination in violation of federal law."[15]

DHS argues that the instant cases bear little resemblance to *Coe*. It asserts that there was no evidence to suggest that the problems respondents encountered were "the result of a DHS policy" or "standard course of action" as opposed to

---

[15] *See, e.g.*, 42 C.F.R. § 435.916(d)(1) ("Prior to making a determination of ineligibility, the agency must consider all bases of eligibility"); *Crippen v. Kheder*, 741 F.2d 102, 106-07 (6th Cir. 1984) (holding that the agency's "policy of automatically terminating the benefits of [M]edicaid recipients solely because their SSI benefits have been terminated without determining whether they qualify as medically needy individuals violates the regulations promulgated under the Social Security Act").

processing errors or other human mistakes. Moreover, DHS argues, even if arguendo the ALJ had authority to issue the challenged orders, "broad[] relief in the form of an injunction was simply not necessary."

Respondents assert that the relevant "policy" is "DHS delaying benefits it agrees are owed because of a computer system it knows is wrong." They also argue that DHS has waived or forfeited the arguments it has raised in its brief by stating that it had no objection to issuance of the challenged April 7 order and by voicing no objection to the appropriateness of the challenged orders. In much the same vein, our dissenting colleague would hold that DHS waived the arguments it has raised on appeal in that it forwent the opportunity to have counsel participate in most of the OAH hearings[16] and in that DHS's non-lawyer representatives stated that they had

---

[16] DHS explains that "[a]s a practice, DHS representatives at OAH hearings are not attorneys." It implies that this practice is in response to D.C. Code § 4-210.10 (DHS "shall not be represented by an attorney [when] the claimant is not represented by an attorney").

In the instant cases, all of the respondents were represented by attorneys (in Ms. Gans's and Mr. Ebron's cases, at the request of the ALJ), either from the outset or by the time the challenged orders were issued. The record does not say why counsel from the DHS Office of General Counsel ("at least seven lawyers," according to one of the ALJs) did not participate in the hearings in these cases. However, we take notice that in FY2022, OAH closed 1,308 cases involving DHS and another 360 during the first quarter of FY2023. *See* https://dccouncil.gov/wp-content/uploads/2023/02/OAH-Performance-Oversight-2023-Prehearing-

"no questions" or "nothing else" at the end of long colloquies that included mention of potential or proposed policy-correction orders.

## IV.    Standard of Review

"In order to be affirmed on appeal, '(1) [OAH's] decision must state findings of fact on each material, contested factual issue; (2) those findings must be based on substantial evidence; and (3) the conclusions of law must flow rationally from the findings.'" *Yates v. U.S. Dep't of the Treasury*, 149 A.3d 248, 250 (D.C. 2016)

---

Questions-and-Responses.pdf; https://perma.cc/64MA-H55S (last visited February 25, 2025). We think it likely that there was a comparable if not significantly higher number of DHS cases among the 18,661 still-open OAH cases at the end of the first quarter of FY 2023, *id.*, given that the DHS caseload was on the upswing from pandemic-period lows. *See* OAH Annual Report FY 2022 at 14, https://oah.dc.gov/sites/default/files/dc/sites/oah/page_content/attachments/OAH% 20Annual%20Report%20FY22_1.pdf; https://perma.cc/FP6F-SCER (indicating that pre-pandemic, the DHS caseload was about 5,000 cases). We are doubtful that DHS (which, as these consolidated cases demonstrate, sent non-attorney staff to OAH status hearings to focus on problem-solving) was readily equipped to have counsel at every hearing or to closely monitor when counsel for claimants would be present, a circumstance that we deem particularly understandable given that prior to this court's ruling in *Coe*, OAH hearings presented little risk of entry of "policy-correction" orders.

In any event, while the OAH hearing notices in the instant consolidated cases were copied to DHS counsel, the notices described payment delays that DHS did not dispute. And while some of the notices warned of fines if DHS did not correct the computer files of individual petitioners, they did so without also warning or suggesting that the hearings might result in issuance of "policy-correction" orders as to the agency's computer system for all program recipients.

(quoting *Washington Times v. D.C. Dep't of Emp. Servs.*, 724 A.2d 1212, 1216 (D.C. 1999)). "We defer to OAH findings of fact so long as they are supported by substantial evidence." *Rodriguez v. Filene's Basement, Inc.*, 905 A.2d 177, 181 (D.C. 2006). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Gardner v. D.C. Dep't of Emp. Servs.*, 736 A.2d 1012, 1015 (D.C. 1999) (internal quotation marks omitted).

## V.     Analysis

For several reasons, we agree with DHS that the challenged orders cannot stand.

### A.     No "Policy" In Derogation of Law Was Identified.

First, the consolidated record does not support the ALJs' conclusion that the problems respondents encountered were the result of a DHS policy. Quite unlike the DHS acknowledgments in *Coe*, Mr. Murphy's representation to the ALJ in the Gans/Harrison/Ebron cases was that he was "not aware" of any agency policy to

"withhold benefits while . . . system glitches are impacting cases."[17]    And notwithstanding one ALJ's repeated criticism of DHS's "apparent decision to continue calculating . . . monthly benefit amounts based upon incorrect information," none of the respondents identified a DHS practice or policy of ignoring errors or refusing to make manual payments.    When counsel for Ms. Harrison filed their February 15, 2023, motion for a policy-correction order, they asserted that a DHS case reviewer had represented that the problems in her case "were caused at least in part by a 'system glitch,'" and they argued that "this glitch

---

[17] When these cases were before OAH, the ALJs and respondents' counsel made reference to other cases in which beneficiaries had experienced delay.  But especially in light of DHS's representation in its brief that it "administers public assistance benefits for more than a hundred thousand District of Columbia residents each month," anecdotal experience in the "four" instances mentioned by the ALJ in Ms. Gans's case, in the five instant consolidated cases, or even in the seventeen cases mentioned in the declaration of Hanna Endale submitted by Legal Aid in the Harrison/Ebron/Gans cases (which DHS asserts represent "0.01% of the individuals receiving DHS-administered benefits every month") could hardly establish that DHS had a policy, across public benefit programs, as described in the challenged orders. *Cf. Dozier v. Haveman*, No. 2:14-cv-12455, 2014 U.S. Dist. LEXIS 153395, at *3, *9 n.2 (E.D. Mich. Oct. 29, 2014) (certifying a "class of tens-of-thousands" and enjoining the State from terminating class members' Medicaid benefits where "[d]efendants were able to inform the [c]ourt that 3,306 women . . . who applied for more comprehensive Medicaid coverage using the Medicaid-only application were denied enrollment due to a 'computer issue'").  We note that of the seventeen cases mentioned in the Endale declaration, only one is described as involving a "technical error" (that led to a failure to process documentation).

constitutes 'policy'" because it was a "decision to terminate/reduce benefits despite knowledge of this glitch." But nothing in the case reviewer's letter or his mention of "a system glitch which prevented the worker from being [able] to process [Ms. Harrison's] recertification applications timely" implies that DHS had identified or knew of the glitch at the time it erroneously notified Ms. Harrison that her benefits were being terminated. Thus, the Harrison record does not evince what respondents call an "informal policy of [DHS] being bound to its computer despite knowing that the computer was wrong."[18]

Moreover, respondents Butler, Hill, Harrison, and Gans identified no standard practice that caused their benefits to be delayed, and the records in their cases and Mr. Ebron's case do not support a claim that DHS cowed to a built-in technological barrier, declined to initiate manual adjustments or workarounds, or, by the date of the challenged orders, continued to rely on an antiquated or dysfunctional system

---

[18] We note that Ms. Harrison's February 15, 2023, motion sought an order for DHS to cease the "policy" of terminating or reducing benefits "due to the agency's own failure to process timely submitted documentation" or "while timely submitted recertifications or other documents are pending." But on February 24, 2023, OAH issued a differently-focused and much broader order in the Harrison/Ebron cases— an order focused on blaming a computer program—that "DHS shall change its illegal policy of delaying legally eligible public benefits recipients from receiving their benefits because of a faulty computer program[.]"

that it knew would produce incorrect results. Quite the contrary, according to the representations that were before the ALJs, DHS had in place a much-used IT ticket system to resolve technical computer problems that arose in the course of processing cases, and many of the delays involved in these cases were attributed to human error or volume of work rather than computer errors or faulty programs. That is not to say conclusively that evidence of such system problems could not have been presented, but no such evidence was presented.

As recounted above, in Ms. Butler's case, the representations on the record were that the delay in paying P-EBT benefits to Ms. Butler was related to "confusion" and to a "roadblock" between DHS and OSSE regarding the availability of funding from OSSE, as well as to the need to resolve "IT tickets" (i.e., problems for which DHS staff sought IT help)—not to a policy that inherently prevented payment.

In Ms. Hill's case, involving SNAP benefits rather than P-EBT, there was a different unresolved IT ticket that had been issued to assist a worker who had tried to initiate an underpayment for February 2023. Ms. Hill was also owed a March underpayment that, to the understanding of the DHS representative, had simply been "missed by the agency worker"—i.e., that was delayed because of human error.

Further, the ALJ heard from both the DHS representative and Ms. Hill's counsel about the agency's practice from time to time of manually paying benefits to people when they were due. Thus, the record did not evince a policy of "withholding of benefits for relying on the computer problems solely."

In Ms. Harrison's case, pertaining to her underpaid TANF and SNAP benefits, after DHS issued an "expedite" IT ticket to resolve the difficulty a worker encountered in removing earned income and certain child-support income from information from Ms. Harrison's account, the problem was resolved during the less-than-a-month that transpired between OAH status hearings. In addition, within a week after Ms. Harrison's counsel notified DHS that it had failed to update the system to recognize Ms. Harrison's increased shelter expense, DHS made that correction.

In Ms. Gans's case, the paperwork she submitted to document the birth of her daughter was in DHS's system, but staff apparently had failed to review the paperwork and request any additional information that was needed to properly determine Ms. Gans's SNAP and TANF benefit amounts. DHS representative Murphy did not describe a computer problem precluding recognition of an increase in household size, but he did posit worker oversight in failing to ensure that

Ms. Gans's rent expense had been taken into account for purposes of her TANF payment amount, and it is not clear from the record why the ALJ assumed that a computer error or faulty program was to blame. And, according to Mr. Murphy, when the system would not generate an underpayment, the agency turned to manual generation of payments.

As described above, when Mr. Ebron's case first came before OAH, the ALJ heard from the DHS representative that there were problems caused by a computer system that DHS had realized was problematic as long ago as 2016. But, per the record, by months later (and well before OAH issued the challenged policy correction order in his case), the agency had switched to a new system that had enabled it to process Mr. Ebron's application. According to the DHS representative, and as far as the record shows, the further delays in providing his benefits and paying his medical bills were attributable to a number of factors, including the need to wait for SSA processing and the age of some of the bills Mr. Ebron had submitted, not to a dysfunctional computer system.

Mr. Ebron's case perhaps comes closest to involving a DHS policy because, per the DHS representative, the system the agency used in connection with the QMB program had been programmed, for "policy-driven" reasons, not to recognize

medical expenses that fall outside the spend-down budget period. *See generally* 42 C.F.R. § 435.831 (governing what expenses during a budget-period may be deducted from income in establishing eligibility); 53 Fed. Reg. 3589 (Feb. 8, 1988) (HHS guidance advising that a State may choose to "limit [spend-down] deductions to services within the budget period"). But this is unlike the situation in *Coe*, which arose because there was an acknowledged system failsafe that, in *derogation* of clear federal law, issued notices of termination of Medicaid benefits without the agency having sought information to determine whether the beneficiary could qualify on a different basis for continued Medicaid coverage. Nothing in the record suggests that the "policy-driven" programming that affected Mr. Ebron was in derogation of law or entailed a misinterpretation or "misapplication of law" such that the ALJ was authorized under Section 4-210.16(b) to issue broad injunctive relief.[19]

---

[19] The ALJ, who sua sponte noted to counsel for Mss. Harrison and Gans and Mr. Ebron that the OAH enabling statute "actually lets you do a class action," may also have exceeded her authority by circumventing the OAH class-action regulation. *See* D.C. Code § 4-210.16(a) ("Where a request for hearing has been made on an action taken by the Mayor, and the hearing officer finds that the issue or policy involved directly affects or will affect other recipients or claimants similarly situated, the hearing officer may*, upon application by 1 of the recipients who is or will be so affected*, allow a class action on behalf of the others similarly situated.") (emphasis added). Even though OAH has no enforcement power as to its injunctive orders, *see Coe*, 281 A.3d at 608, the ALJ said that she would consolidate Mr. Ebron's case with Ms. Harrison's case "for purposes of enforcement" to

## B.     There was a Lack of Probative Evidence.

Not only do the records in these cases fail to identify a DHS policy that misapplied the law, but the records are entirely lacking in probative evidence of "a faulty computer program" or "an internal computer error." As DHS's brief aptly puts it, the ALJs "simply assumed—without gathering any supporting evidence—that because each beneficiary had experienced some sort of delay, all of the delays must be attributable to the same computer error."

The ALJs issued their broad order even though none of them held an evidentiary hearing in any of these cases. Over the course of the multiple status or show-cause hearings, not a single witness gave testimony "under oath or affirmation subject to the penalty of perjury." 1 D.C.M.R. § 2823.10. Evidence may, of course,

---

"make[] it more powerful." The ALJ's action in urging Legal Aid to "start looking for data to support the wider problem," may have constituted overreaching.

No one can doubt that respondents suffered deprivation, anxiety, hardship and/or other injury from the delays entailed in their cases, or that the ALJs had ample basis (and appear to have acted well within their authority) when they ordered DHS to restore/confer benefits and make the owed underpayments to the respondents. But ALJs are obligated not to overstep their authority. *Cf. D.C. Dep't of Emp. Servs. v. Smallwood*, 26 A.3d 711, 716 (D.C. 2011) (concluding that an OAH ALJ overstepped his authority in making an "obviously well-intentioned but misguided" determination to waive a claimant's overpayment of unemployment compensation benefits).

include documentary evidence,[20] and counsel for Ms. Harrison submitted a declaration under penalty of perjury from a Legal Aid Public Benefits Specialist attesting that seventeen households of Legal Aid clients had their benefits reduced or terminated "due to DHS's own failure to process documents submitted by the recipient." While expressing a valid concern, that declaration did not avow that a faulty computer program or internal computer error was to blame for the problems described. Further, not only did the DHS representatives give no sworn testimony, they also betrayed no specialized technical knowledge that would merit treating their few references to computer "glitches" or IT "tickets" as probative of whether DHS's systems were plagued by software faults that were ignored or tolerated to the point of constituting *de facto* agency policy.[21] While the ALJs ordered DHS to correct its "policy" based on internal computer errors or faulty computer programs, they never made an "explicit finding[]" about any such identifiable error, which was required especially because of "the serious consequences" the orders entailed. *Yates*, 149 A.3d at 252. And to the extent the ALJs viewed themselves as taking official notice

---

[20] *See* D.C. Code § 2-509(b); 1 D.C.M.R. § 2977.6; and 1 D.C.M.R. § 2823.10.

[21] For example, Mr. Murphy represented that IT matters were not within "the scope of [his] duties."

of (putative) DHS computer-program problems as "a material fact not appearing in the evidence in the record," D.C. Code § 2-509(b), they failed to announce the notice and afford DHS "an opportunity to show the contrary." *Id.*

It is true that the DHS representatives did not ask for an evidentiary hearing and that DHS did not appear at the hearings through counsel who might have been more attentive to required procedure. But the ALJs had an independent duty to take evidence in order to make findings of fact that could establish their authority to grant broad injunctive relief. *See Alston v. D.C. Dep't of Emp. Servs.*, 314 A.3d 58, 67 (D.C. 2024) (stating that the "several important obligations" of OAH ALJs include "(1) weighing the evidence; (2) making findings on every contested material fact; (3) making conclusions of law that rationally flow from those facts; and (4), where necessary to making findings of fact and conclusions of law, completing the administrative record"); D.C. Code § 2-509(e) ("Every decision and order adverse to a party to the case, rendered by the Mayor or an agency in a contested case, shall be in writing and shall be accompanied by findings of fact and conclusions of law.... Findings of fact and conclusions of law shall be supported by and in accordance with the reliable, probative, and substantial evidence."). ALJs' obligation to rule on the basis of substantial evidence requires them to "get to the

bottom of the issue." *Alston*, 314 A.3d at 67. Uniformly, in these consolidated cases the ALJs did not do so on the policy-correction issue.

The records in these cases also show that the ALJs lacked a substantial basis for a determination that broad injunctive relief was necessary. As described above, in Ms. Hill's case, the ALJ issued the April 7 policy-correction order even though DHS had already restored Ms. Hill's SNAP benefits to the proper monthly allotment and paid her all of the SNAP underpayments that were owed to her. Similarly, the challenged April 10 order itself noted that as of its date, Mr. Ebron "ha[d] what he needs" and Ms. Harrison would "receive TANF benefits totaling $851 and SNAP benefits totaling $838 for April 2023" (and, during an April 18 status conference, it was confirmed that Ms. Harrison did receive the correct amount for April 2023). Although relief for their co-party Ms. Gans was still pending as of April 10, resolution of the Harrison and Ebron problems was a factor that the ALJ should have recognized as weighing against the need for the broad injunction the ALJ issued.

### C. There Was No Waiver or Forfeiture.

Our dissenting colleague's view is that the arguments DHS presents in its briefs have been waived. He focuses on a response Mr. Manga gave to a question

the ALJ posed after first referring to the relief that Ms. Hill's counsel advocated and then describing what the ALJ's contemplated order would require: "We'll order DHS to restore the benefits" and "[i]ssue underpayments to Ms. Hill." The ALJ's question was, "Do you have any questions about that, Mr. Manga?" Mr. Manga answered, "No, Your Honor." Because the ALJ's reference to "that" directly followed her reference to ordering DHS to restore benefits and issue underpayments to Ms. Hill, Mr. Manga's answer that he had no questions about "that" is most naturally read to mean that he had no questions about such a claimant-specific order. Fairly read, the hearing transcript does not support that Mr. Manga, a non-attorney, agreed to an order directing DHS to correct its policy of withholding benefits to "legally eligible public benefits recipients" broadly, "based on an internal computer error."

Our dissenting colleague regards Mr. Manga's "No, Your Honor" response as in answer to a question that the ALJ posed ten transcript lines earlier: "Do you have any objection" to Ms. Hill's counsel's request for an order to DHS "to fix its illegal policy of delaying public-benefit recipients from receiving their benefits, due to this faulty computer program[]." On that basis, our colleague asserts that Mr. Manga's answer was a waiver. We cannot agree. Our case law is clear that "a waiver must

be clear and unambiguous." *Lacek v. Wash. Hosp. Ctr. Corp.*, 978 A.2d 1194, 1200-01 (D.C. 2009) (citing *Eagle Maint. Servs. v. D.C. Contract Appeals Bd.*, 893 A.2d 569, 577 (D.C. 2006)). A "waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993). "We do not easily impute affirmative waiver[.]" *Melbourne v. Taylor*, 147 A.3d 1151, 1155 (D.C. 2016). At worst, Mr. Manga's "No, Your Honor" answer was an ambiguous answer to an ambiguous compound question. His answer does not support a determination of waiver.

There is ample reason to conclude that DHS also did not forfeit its argument that broad injunctive relief was not warranted. First, DHS representatives reported to the ALJs when respondents' problems had been resolved, implying that there was no need for broad injunctive relief. For example, at the March 31, 2023, hearing, DHS representative Manga told the ALJ that he did not believe the case should be kept open because Ms. Harrison's benefits had been issued. This was enough to preserve the argument that the subsequent April 10, 2023, order was not justified. Also, DHS representative Wilder let the ALJ know, regarding Mr. Ebron, that the ball was now in his or his counsel's court to "keep [his QMB] coverage going" with an application for the required new certification. This, too, should be regarded as a

representation that the forthcoming April 10 injunctive order was not needed. Because parties seeking appellate review "are not limited to the precise arguments they made below," *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992), DHS is entitled to press its point that the broad injunctive relief the ALJ nevertheless ordered was inappropriate and unwarranted.

Further, we cannot find a forfeiture on the grounds that DHS did not immediately seek reconsideration of orders containing broad injunctive language (e.g., the February 28, 2023, order and the March 3, 2023, order in what were then the Harrison/Ebron cases) and did not send counsel to the hearings at which the ALJs determined to issue the challenged orders. In her introductions to the February 28 and March 3 orders, the ALJ summarized them as requiring correction of a policy of withholding benefits "to which *the above-captioned Petitioner*s are entitled" (emphasis added), and thus, despite the broad language in the relief section of the orders, the orders could be read much more narrowly than the broad language in the challenged April 10 order (which contained no misleading summary language).

Further, the OAH scheduling orders would not necessarily have put DHS counsel on clear notice that the order of relief that could emerge from scheduled

status hearings would be broad policy-correction orders.[22]  For example, OAH's notice of the hearing scheduled for March 29, 2023, in Ms. Butler's case, which described specific relief for Ms. Butler, would not have alerted DHS's counsel that OAH might issue the broad order it issued in March 30, 2023: an order that DHS "correct its policy of illegally delaying public benefits recipients from receiving their benefits due to a faulty computer program[.]"[23]  Nor did DHS's representative at the March 29 Butler hearing necessarily understand during the hearing that the ALJ was signaling his intent to issue such a broad order.  On February 28 and March 3, in what was then the Harrison/Ebron consolidated matter, the ALJ had issued a much

_____

[22] Our dissenting colleague highlights that on February 23, the ALJ in the Harrison/Ebron case issued an order, copied to lawyers in the DHS Office of General Counsel, that scheduled a status conference and transmitted an attached "Proposed Order Requiring DHS to Correct an Unlawful Policy," to be discussed at that scheduled conference.  But the attached proposed order stated on its first page that, "This order requires the Department of Human Services (DHS) to correct its unlawful policy of relying upon a computer program which withholds Medicaid and SNAP benefits *to which the above-captioned Petitioners* [i.e., Harrison and Ebron] *are legally entitled*."  In short, the proposed order copied to DHS counsel was not unambiguously the broad policy-correction order that the ALJ went on to issue (and thus the accompanying status-conference notice did not give an unambiguous notice of the "issues involved." D.C. Code § 2-509(a)).

[23] *See Coto v. Citibank FSB*, 912 A.2d 562, 568 (D.C. 2006) (citing OAH scheduling order that identified only timeliness and jurisdiction as issues, "which conceivably could have lulled" Citibank into not attending a hearing, and concluding that it would therefore be inappropriate to enter a default judgment against Citibank for failure to attend the hearing).

narrower order to DHS "to correct its unlawful policy of relying upon a computer program which withholds Medicaid, [SNAP] and [TANF] benefits to which *the above-captioned Petitioners* [Harrison and Ebron] are legally entitled" (emphasis added). The ALJ in Ms. Butler's case appeared to have that relatively narrow order in mind when he referred to "at least two other such orders from other judges at OAH" as the reason why he did not "have a problem" issuing the challenged March 30 order.

In any event, regardless of the weight given to the foregoing points, there is a well-established principle that precludes a conclusion that DHS's main argument was forfeited: the principle that "even if a claim was not pressed below, it properly may be addressed on appeal so long as it was passed upon." *Black v. D.C. Dep't of Hum. Servs.*, 188 A.3d 840, 848 (D.C. 2018) (internal quotation marks omitted) (reasoning that the fact that the ALJ ruled on the issue of the petitioner's eligibility for certain retroactive benefits "was sufficient to preserve the claim for our review"); *see also*, *e.g.*, *Youngblood v. D.C. Bd. of Zoning Adjustment*, 262 A.3d 228, 239 n.5 (D.C. 2021) (reasoning that issue was "sufficiently preserved" where "the BZA itself affirmatively addressed it in its own ruling"); *Rodriguez v. D.C. Off. of Emp. Appeals*, 145 A.3d 1005, 1010 n.6 (D.C. 2016) ("[T]he short answer to . . . [the]

preservation point is that the Hearing Officer flagged the . . . issue *sua sponte* and the Deciding Official and the OEA addressed it." (internal quotation marks omitted)). Here, the ALJs in each of the cases took pains to explain in their challenged orders their reasons for concluding that an unlawful DHS "policy" and misapplication of law within the meaning of Section 4-210.16(b) were entailed. Thus, the ALJs were "fairly apprised as to the questions on which [they were] being asked to rule," *Tindle v. United States*, 778 A.2d 1077, 1082 (D.C. 2001) (quoting *Hunter v. United States*, 606 A.2d 139, 144 (D.C. 1992), *cert. denied*, 506 U.S. 991, 113 S.Ct. 509, 121 L.E.2d 444 (1992)), and they ruled in a manner that makes appellate review of the issue proper.

Further, even had there been a forfeiture of the argument that there was no necessity for an order requiring DHS to correct its policy of "delaying public benefits recipients from receiving their benefits due to a faulty computer program," that would not foreclose consideration of the argument now, because we may excuse forfeitures if we discern plain error in issuance of the challenged orders. While "[c]laims not properly preserved in the administrative setting are generally considered forfeited," *Black*, 188 A.3d at 847, the principle is "one of discretion rather than jurisdiction." *District of Columbia v. D.C. Contract Appeals Bd.*, 145

A.3d 523, 530 n.9 (D.C. 2016) (internal quotation marks omitted). We "may show a measure of flexibility [as to contentions not urged at the administrative level] when the interests of justice so require." *Moore v. D.C. Dep't of Emp. Servs.*, 813 A.2d 227, 229 n.5 (D.C. 2002) (internal quotation marks omitted) (permitting consideration of new argument on appeal that agency had relied on a misconception of the law, because "the interests of justice counsel us not to ignore the plain error that infect[ed]" the agency's reasoning); *see also Williams v. D.C. Dep't of Pub. Works*, 65 A.3d 100, 109 (D.C. 2013) (reasoning that the interests-of-justice standard is met where "the record . . . does not support [the agency's] position"). We are "not obliged to stand aside and affirm an administrative determination which reflects a . . . faulty application of the law." *Young v. D.C. Dep't of Emp. Servs.*, 268 A.3d 827, 830-31 (D.C. 2022) (internal quotation marks omitted); *see also In re Chapman*, 284 A.3d 395, 402 (D.C. 2022) (explaining that we may exercise our discretion to address an issue to "put[] to rest a recurring question").

Here, because there was no record *evidence* to support broad injunctions requiring DHS to correct a "policy" of withholding or delaying benefits "based on an internal computer error" or "faulty computer program," and no DHS acknowledgment of any such policy, plain error did infect the ALJs' issuance of the

challenged orders in these cases. Although some of the representations by DHS representatives—e.g., the representations by Ms. Fitzgerald about her determination that "there was no system error or glitch" in Ms. Gans's case, but instead "a processing error on the part of the caseworker"—were not before the ALJ before she issued the challenged April 10 order, those representations now make it plain that the ALJ needed to take evidence and make factual findings about the source of the delays before issuing her challenged order—as even the ALJ later recognized. During a June 27, 2023, hearing, the ALJ acknowledged that she had not "actually been told what the problem was," stated that she "had been told these were computer problems," and commented that she might "need to hold an evidentiary hearing to figure out" why there were delays.[24] The ALJ in Ms. Hill's case similarly acknowledged the need for testimony (i.e., as she put it in an April 24 never-sent order, the need for a "witness who can explain . . . how computer problems continue

---

[24] DHS did not request an evidentiary hearing, but the ALJ could have scheduled one on her own initiative in order to make a record to support the orders she issued. OAH ALJs have authority to issue subpoenas sua sponte, *see* 1 D.C.M.R. §§ 2824.1 and 2824.2, and OAH's rules specifically provide for evidentiary hearings at which "[a]ll witnesses must testify under oath or under penalty of perjury." 1 D.C.M.R. §§ 2821.6 and 2821.11. And, because respondents had the burden of proof, *see* D.C. Code § 2-509(b) ("[T]he proponent of a rule or order shall have the burden of proof"), the burden of requesting evidentiary hearings properly fell on them.

to prevent DHS from issuing benefits" and "what efforts DHS is making to correct the problems"), recognizing that she had not heard from "a witness who can testify about the computer problems." She commented nearly a month after she had issued the challenged April 7 order that "I think I'm going to indicate that Mr. Manga did testify about the ongoing computer program issues that everyone is having" (even though Mr. Manga gave no sworn testimony and referred only vaguely to "the general glitch that has been experienced at agency").[25] And the ALJ in Ms. Butler's case likewise issued the challenged March 30 order without any such testimony and before sorting out the factual dispute between DHS and OSSE about the agencies' respective roles in providing the delayed P-EBT benefits.

---

[25] The ALJ in Ms. Hill's case did schedule an evidentiary hearing for March 23, 2023, but then converted it to a status hearing at Ms. Hill's request (and DHS's acquiescence), upon her counsel's acknowledgment that DHS "ha[d] already started working to issue benefits."

## VI. Conclusion

For all the foregoing reasons, the challenged orders are vacated.[26]

*So ordered.*

DEAHL, *Associate Judge*, dissenting: DHS passed on countless opportunities before OAH to challenge the orders that it now complains about for the first time on appeal. It did not file written oppositions, or state oral objections, to the claimants' written motions seeking these policy correction orders. DHS could not even be bothered to send representatives to OAH hearings where it had received notice that

---

[26] The dissent is correct that in these now-consolidated cases, the ALJs issued a series of virtually identical policy-correction orders. DHS did not petition for review of some of them, and that at least arguably is a reason why we might have treated the instant petitions as moot. *See In re S.G.*, 71 Cal. App. 5th 654, 666 (Cal. Ct. App. 2021) (recognizing that an appeal can be rendered moot where reversal of the order on appeal would not afford the appellant effective relief unless the appellate court could also order reversal of an order that was not appealed). That is not, however, a reason to affirmatively uphold the challenged orders in these cases, which were entered without probative evidence of a "faulty computer program" or "internal computer error" or misapplication of law, and which the ALJs issued without a demonstrated need for an OAH "policy-correction" injunction pertaining to public-benefits recipients broadly. Nothing in this opinion will foreclose an ALJ from issuing needed injunctions in future cases based on probative evidence in the record.

the sole purpose of the hearings was to discuss these proposed orders. Worse yet, after months of notice that these orders would issue—and several weeks after some of them had issued—and after OAH's multiple invitations effectively imploring DHS's general counsel to send a legal representative to upcoming hearings if they had any objections to the orders, DHS instead sent a lay (non-attorney) representative who affirmatively stated that DHS had no objection to the orders. That was an express and affirmative waiver of the claims that DHS now seeks to resurrect on appeal, and unlike my colleagues, I see no basis to relieve DHS of its waiver, and I detect no plain error even if we were to disregard that waiver. I would affirm the orders because DHS affirmatively waived any objections to the orders that it now challenges, so I dissent.

## I. Factual Background

### A. DHS's Persistent Underpayments, Defying Statutes and Countless Orders

The respondents are a group of five individuals who have had a hell of a time trying to get DHS to meet its statutorily-mandated deadlines for making benefits payments. They and their families have been repeatedly underpaid and often received their benefits late. Confronted with DHS's systemic failures to make timely

benefits payments, and its extraordinary delays in correcting the errors that it was aware of, several ALJs issued routine orders directing DHS to promptly ameliorate its legal violations. That did not work. DHS spent months refusing to comply with those orders, invariably scapegoating "a faulty computer program" for its mistakes and excessive delays, prompting the ALJs to issue the "policy correction orders" that are now at the center of this appeal.

Respondent Angela Butler's experience is representative of the group's. She and her three grandchildren depended on government benefits for life's basics, like food, and were entitled to SNAP (food stamps) and P-EBT (school lunch replacements during the pandemic) benefits. Those benefits were underpaid to the tune of thousands of dollars beginning in July 2022, and for many months thereafter. Butler contacted DHS in October 2022 in an effort to fix the underpayments, and a DHS employee confirmed that she was being underpaid due to "a few errors," including that she was listed as having a household of three instead of four. That same month Butler sought OAH review to correct the underpayments, and at an OAH hearing on November 2 a DHS representative assured Butler and the tribunal that the underpayments would be "resolved long before the end of this month." That didn't happen. After several more months, and a couple of intervening OAH

hearings, OAH held a fourth hearing on February 21, 2023, where DHS acknowledged that it had not resolved the underpayments and needed "two weeks or so" more to do that. At a fifth OAH hearing nine days later, DHS again acknowledged it had still not corrected the problem, averring that there were "technical things that needed to be done in the DC benefit system" to fix the problem. At a sixth hearing three weeks later, on March 21, DHS still had not corrected the problem and cited to an "IT problem" as the reason why. DHS stated that it had "no objection to . . . an order" requiring DHS to pay Butler within the week, and the ALJ entered an order that same day directing that the problem be corrected by March 28.

By the time of the seventh OAH hearing on March 29—where the majority begins its telling of this procedural history, skipping the first six hearings over several months—it had been more than five months since Butler raised the underpayments with DHS and sought relief from OAH. Yet the problems still had not been corrected (she had finally received her late SNAP, but not her P-EBT, benefits). DHS again blamed "IT" problems at the hearing, and again assured Butler and the ALJ that the problem would be fixed within "24 to 72 hours." Butler asked the ALJ to order DHS "to correct its policy of illegally delaying public benefits" payments, and DHS did not object. The ALJ then said he would "issue an order to

that effect" and gave DHS an opportunity to address "anything else," and DHS again did not object to the proposed order. The ALJ then entered the requested order the following day, on March 30, which DHS now appeals. Ninth, tenth, eleventh, and twelfth OAH hearings were held over the next few months, and DHS finally corrected its P-EBT underpayments in July 2023, a full year after the underpayments began.

The other respondents' stories are similar. Their benefits were likewise underpaid for many months. DHS acknowledged its legal violations and despite its repeated assurances that it would remedy them, and ALJ orders directing them to do so, DHS hid behind its computer systems and averred that there was nothing it could do to work around them. So in each of those cases ALJs issued virtually identical orders, without any objection to any of them, directing DHS to correct "its policy of illegally delaying public benefits recipients from receiving their benefits due to a faulty computer program."

## B. DHS Does Not Challenge the Prospective Orders and Sends no Legal Counsel

Another striking throughline of these cases is that the ALJs effectively implored DHS to send legal representatives to the underlying hearings so that they

could lodge whatever objections they had to the orders now on appeal. DHS refused to send counsel to the hearings and otherwise failed to lodge any objections. Respondent Chakyya Harrison's case—the first in which any of these policy correction orders were issued—best illustrates the point.

Similar to Butler, Harrison and her three children depended on benefits for food and housing, and DHS issued SNAP and TANF underpayments to her dating back to September 2022, causing her to miss rent payments. When Harrison could not get DHS to fix the undisputed underpayments, she requested an OAH hearing. DHS acknowledged prior to any OAH hearing that it had issued underpayments, citing to a "system glitch" as the cause. When DHS failed to correct the underpayments on its own, OAH held three hearings between January 11 and February 2, 2023, to figure out why they had not been corrected. Harrison was counseled at each of those hearings, whereas DHS sent only a non-lawyer policy analyst (Nelson Manga), despite the option to send its own legal counsel instead. *See* D.C. Code § 4-210.10 (permitting DHS to send legal counsel where claimant is counseled). DHS's answers for its legal violations were basically the same as they were in Butler—computer glitches that it could not work around precluded it from complying with its legal obligations.

By the third hearing on February 2, the ALJ was clearly fed up that DHS had "wildly missed its [statutory] deadline" for correcting the problem—she posited without refute that, by statute, it had 45 days from the September underpayments to correct the issue. *See* D.C. Code § 4-205.26. The ALJ thus stated her intent to issue an order requiring DHS to correct Harrison's income within three business days. The ALJ then issued a detailed written order directing DHS "to update its records" to accurately reflect the undisputed amounts owed to Harrison before the fourth hearing, scheduled for February 9. The ALJ served that order on "everybody" in DHS that she could "think of including two [lawyers] in [DHS's] office of the general counsel."

Nonetheless, DHS still sent no legal counsel to the February 9 hearing, at which Manga again represented that DHS was having "technical difficulties" in getting Harrison paid the money she was owed. The ALJ responded by setting a hearing directing DHS to "show cause" why it should not be sanctioned for failing to comply with its statutory requirements and the ALJ's previous orders, where there was "no excuse" for "not being able to fix" Harrison's payments. Once again, the ALJ served the show cause order on multiple lawyers in DHS's office of general counsel, and she set a hearing for one week later, on February 16. The day before

that hearing, Harrison's counsel filed a motion requesting the ALJ issue an order directing DHS to correct its "unlawful policy" of failing to correct underpayments in a timely manner—the genesis of all of the orders now on appeal. The motion indicated that Harrison's case was but "one example of a widespread issue" of DHS not timely processing statutorily mandated benefits payments for extended periods after errors had come to light. Counsel served that motion on multiple lawyers in DHS's general counsel's office.

DHS filed no opposition and again sent no legal representative to the February 16 show cause hearing, at which Manga again cited "technical difficulties" in getting Harrison paid. The ALJ indicated at the hearing that she was inclined to issue the policy correction order that Harrison had requested, and Manga did not object. The ALJ expressly asked Manga if there was "anything he want[ed] to add," and he said, "No, Your Honor." DHS's persistent failures to object is a running theme that would pervade literally dozens of hearings across these five cases over the following months where these orders were discussed.

One week later, with Respondent Albert Ebron's case now consolidated with Harrison's, the ALJ provided the parties with a proposed order on February 23, 2023. That proposed policy correction order required "[DHS] to correct its unlawful policy

of relying upon a computer program which withholds Medicaid and SNAP benefits to which [Harrison and Ebron] are legally entitled." The ALJ again served that proposed order on multiple attorneys in DHS's general counsel's office, who were likewise served with an order setting a status hearing the following day for the express purpose of discussing the proposed order.

No one from DHS attended the following day's hearing—not even a policy analyst—during which the ALJ fielded a number of relatively minor edits and suggestions to the order. The ALJ then issued the order five days later on February 28, 2023. This first policy correction order issued in the consolidated cases before us required DHS "to correct its unlawful policy of relying upon a computer program which withholds Medicaid, [SNAP], and [TANF] benefits to which [Harrison and Ebron] are legally entitled." Again, the ALJ served the order on DHS, including multiple lawyers in its general counsel's office. The ALJ also set a status hearing for a few days later, on March 2, 2023, and served multiple lawyers in DHS's general counsel's office with notice of that hearing as well.

DHS again filed no written opposition and sent no representative to the March 2 hearing—no legal counsel or policy analyst—to the ALJ's expressed chagrin that she could not get DHS counsel to show up for any of the hearings:

> I am disappointed, but not completely surprised, that there's nobody from DHS on this call. As you should have seen from the certificate of service on my orders, I sent this to two different members of the Office of General Counsel. *So I am perplexed as to why there's no DHS attorney on this call. There's at least seven lawyers in that office. I don't know why somebody couldn't make time to talk to me for fifteen minutes.*

## C. DHS Expressly Waives Any Objection to the Orders It Now Challenges

More than a month after the first policy correction order was issued in Harrison and Ebron's cases, OAH held a hearing to consider issuing a roughly identical order in Respondent Gladys Hill's case. And, you guessed it, DHS did not send a legal representative to that hearing either. In the unlikely event that DHS's litigation conduct had not yet made clear that it had no objection to these orders being issued, they made that explicit at Hill's hearing through their chosen representative, policy analyst Manga.

At that April 6, 2023, hearing, DHS echoed its familiar refrain that there were "several technical issues" precluding it from making timely payments to Hill, and like the other respondents before her, Hill requested that OAH "order DHS to fix its illegal policy of delaying public-benefits recipients from receiving their benefits due

to this faulty computer program." The ALJ asked, "Do you have any objection to that Mr. Manga?" He replied: "No, Your Honor."

About a month later, on May 1, DHS filed the first of several now-consolidated petitions for review in this court, where for the first time it now seeks to challenge the underlying orders.

## II. Analysis

I hardly think any legal analysis is necessary where the above facts speak for themselves. DHS has blatantly, and through the most egregious course of conduct imaginable, waived any challenge to the orders it now belatedly seeks to appeal. Over the course of dozens of hearings, spanning many months, DHS neither voiced nor memorialized any objection to the many policy correction orders that it now seeks to challenge for the first time. DHS then expressly waived any objection to the policy correction orders that it now challenges before us in Hill's case,[1] and there

---

[1] One could quibble over whether DHS merely forfeited its challenges, rather than waived them, as to four of the five respondents. *See generally Chew v. United States*, 314 A.3d 80, 89-100 (D.C. 2024) (Easterly, J., concurring) (discussing the difference between the doctrines). The difference can be critical, because forfeited errors generally receive plain error review, while waived ones receive no review at all. *Id*. at 91. I happen to think that DHS's repeated failures to object over the course of so many hearings over such a protracted period should be treated as a waiver in

is simply no conceivable justification on this record for us to forgive that express waiver.

As a rule, this court "will refuse to consider contentions not presented before the administrative agency at the appropriate time" absent "exceptional circumstances." *Goodman v. D.C. Rental Hous. Comm'n*, 573 A.2d 1293, 1301 (D.C. 1990). There are at least four good reasons underpinning that rule that we should not lightly shrug off.

First, requiring objections gives the agency an opportunity to address and correct any errors, preserving the courts' and the parties' resources and avoiding the need for appeal altogether. *See Evans v. United States*, 304 A.3d 211, 219 (D.C. 2023) ("The main reason for requiring objections is to 'allow the other side to respond and the trial court to correct the error and thereby'" avoid any appeal jettisoning the initial tribunal's proceedings) (quoting *Whitaker v. United States*, 617 A.2d 499, 508 (D.C. 1992)). Second, it ensures that appeals are based on a fully

each case, but the point is irrelevant. As the respondents point out in their brief without refute, if any one of these orders survives appellate review, that would render review of the other orders effectively moot. And DHS expressly waived any challenge to these orders at least in Hill's case, and that is enough for waiver to be the relevant doctrine here.

developed record, i.e., the very deficiency that the majority now bemoans as requiring us to vacate these belatedly challenged orders. *Hormel v. Helvering*, 312 U.S. 552, 556 (1941) ("[A]n appellate court does not give consideration to issues not raised below" because requiring objections "is essential in order that the parties may have the opportunity to offer all the evidence they believe relevant to the issues."). Third, though the force of this reason is often drastically overstated, is that it prevents parties from strategically withholding arguments at the underlying proceedings only to deploy them on appeal if they lose. *Puckett v. United States*, 556 U.S. 129, 134 (2009) ("[T]he contemporaneous-objection rule prevents a litigant from 'sandbagging' the court—remaining silent about his objection and belatedly raising the error only" on appeal.) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 89 (1977)). Fourth, it reflects some respect for the authority of the underlying agency. *See Goodman*, 573 A.2d at 1301 ("[A] reviewing court 'usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the Commission of an opportunity to consider the matter.'") (quoting *Unemployment Comp. Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946)).

Those principles require us to reject without considering DHS's late-breaking challenges to the orders it now appeals because DHS waived its objections to these orders. The majority offers three counters, but none of them holds water.

First, the majority contends that DHS did not clearly waive its objections to the policy correction order in Hill's case when, at an April 6 hearing, DHS's chosen representative said he had no objection to it. *Ante* at 34-35. Here's the full relevant exchange—which the majority finds ambiguous—where Hill's counsel describes the requested order, the ALJ then lays out a further detailed description of what's proposed, and Manga replies that he has no objection to it:

> Hill: We request that Your Honor, order DHS to fix its illegal policy of delaying public-benefit recipients from receiving their benefits, due to this faulty computer program, with a short turnaround time for compliance, such as one week. We further request that, Your Honor, order DHS to come back to OAH to demonstrate their compliance with the order via a status conference, shortly after that deadline for compliance.

> ALJ: Do you have any objection to that, Mr. Manga? As essentially, what Ms. [Hill] is requesting is that I issue an order, *ordering DHS to cease this illegal policy*, where they are denying benefits based on the faulty computer program. We'll order DHS to restore the benefits. Issue the underpayments to Ms. Hill. And then schedule a hearing, maybe within a week or two, where DHS would have to come in and show that the situation has been

rectified. Do you have any questions about that, Mr. Manga?

DHS: No, Your Honor.

That, with the backdrop of months of earlier hearings in which DHS voiced no objection to these orders, amounts to a clear and explicit waiver of any objection to the policy correction orders.

My colleagues disagree because the ALJ asked a compound question of DHS's representative, so it describes the above as "an ambiguous answer to an ambiguous compound question." *Ante* at 35. But there's nothing ambiguous about the question, "Do you have any objection to that," nor is there anything ambiguous about the answer, "No." So I guess what the majority means is that people can't be expected to remember the first part of a compound question ("Do you have any objection?") uttered seconds before what is essentially a repetition of it ("Do you have any questions?"). One problem with that view is that the two parts of the question were essentially the same: asking whether somebody has questions about a proposed order is not meaningfully different, in the above context, with asking if they have any objections to it. Manga's answer was quite clearly that he understood

the order—who couldn't?—and had no objection to it. It was a clear and express waiver.

Putting that aside, I would be slightly more sympathetic to the majority's view in a vacuum, if this were the only evidence of a waiver, or a one-time fleeting question that DHS's representative was caught flat-footed by during the heat of a hearing. But remember that DHS's course of conduct had already made it abundantly clear that it had no objection to these policy-correction orders—it did not respond or file any oppositions to the written motions seeking these orders, and it could not even bother to send representatives to hearings despite having notice that they were being held for the sole purpose of discussing their legality and the prospect of entering them.[2] And prior to the above express waiver, several virtually identical policy correction orders had already been issued in the now-consolidated cases—

---

[2] The majority posits that OAH's "scheduling orders would not necessarily have put DHS counsel on clear notice that the order of relief that could emerge from scheduled status hearings would be broad policy-correction orders." *Ante* at 37. That's wrong. For instance, on February 23 the ALJ in Harrison and Ebron's case served DHS and members of its general counsel's office with the text of a proposed policy correction order, directing "that DHS shall change its illegal policy of delaying legally eligible public benefits recipients from receiving their benefits because of a faulty computer program," and instructed the parties that "[t]he court and parties will discuss this Order at the [following day's] Hearing." Nonetheless, DHS sent no representative to the following day's hearing, which resulted in the first of these policy correction orders being entered.

dating back to February 28—so it is absurd to think DHS and its representative did not know precisely what order the ALJ in Hill's case was proposing to issue, and there is no ambiguity that DHS was expressly stating it had no objection to it, just as its course of litigation conduct had already made clear.

Second, the majority posits that "there is ample reason to conclude that DHS did not forfeit its argument," followed by several pages of irrelevancies in which only one thing stands out—there was never any objection to the orders and the majority cannot point to any. *Ante* at 36-39.

Third, the majority posits that we should forgive DHS's forfeiture because it "discern[s] plain error" and "the interests of justice so require" us to do so. *Ante* at 40. I have three responses.

I have already explained my first response: the stricter "waiver" doctrine applies here, not forfeiture, and my colleagues do not even attempt to justify considering DHS's claims if they were waived (as they were). DHS expressly stated it had no objection to the challenged orders in Hill's case, so even plain error review is inapt on this record. *See supra* n.1.

My second response is, assuming arguendo that only the less exacting plain error test applicable to merely forfeited errors applies here, DHS cannot satisfy even the first two prongs of plain error review—whether there was "error" that is "plain." *United States v. Olano*, 507 U.S. 725, 733-34 (1993). On this record it is far from plain that DHS did not have a policy of refusing to promptly issue benefits payments and failing to correct its apparent computer malfunctions that repeatedly led to their inability to comply with the law. Contrary to the majority's decision to hold that record uncertainty against the respondents, the burden of establishing plain error falls on the petitioners here, so any record uncertainty counts against them. *See Alleyne v. United States*, 327 A.3d 472, 484 (D.C. 2024) ("The plain-error test imposes a 'formidable' burden *on appellants who advance unpreserved claims.*" (quoting *Hunter v. United States*, 606 A.2d 139, 144 (D.C. 1992))) (emphasis added); *see also Lowery v. United States*, 3 A.3d 1169, 1177 (D.C. 2010) (declining to remand for evidentiary hearing on unpreserved issue where that "would violate the plain error rule and our precedent by shifting from the appellant the burden of demonstrating plain error on the existing record").

DHS's constant and tiresome refrain that nothing could be done about its computer glitches that led to persistent underpayments is very strong and unrebutted

evidence that such a policy existed. There is a phrase in the law where an institutional party refuses to correct persistent violations within its ranks: it is called a "de facto policy." *Young v. District of Columbia*, 752 A.2d 138, 146 (D.C. 2000) (citing *Gomez v. City of West Chicago*, 506 F. Supp. 1241 (N.D. Ill. 1981)). And nothing in *Coe v. D.C. DHS*, 281 A.3d 603, 607 (D.C. 2022), or any of our other precedents suggest that ALJs cannot issue policy correction orders in response to such pervasive de facto policies as DHS's. I see no good reason why they should not be treated just the same as more formal policies, and in any event, it is not plain from our precedents that they should not be.

My third response is that even if the ALJs had committed some plain legal error by issuing these orders, I could not disagree more with my colleagues about where "the interests of justice" lie in this case.[3] All these orders do is give the respondents an opportunity to bring DHS into the Superior Court for an enforcement action, where the court—complete with a contempt power that ALJs lack—can assess whether DHS is willfully failing to comply with them. In the unlikely event

---

[3] In the more usual parlance of plain error's third and fourth prongs, any errors did not affect DHS's "substantial rights," nor did they "seriously affect[] the fairness, integrity or public reputation of" the underlying proceedings. *Alleyne*, 327 A.3d at 484 (quoting *Griffin v. United States*, 144 A.3d 34, 37 (D.C. 2016)).

that DHS truly cannot comply with its legal obligations because of the intractable computer glitches that it has hidden behind, that would operate as a complete defense to any contempt finding. *United States v. Rylander*, 460 U.S. 752, 757 (1983) ("In a civil contempt proceeding such as this, of course, a defendant may assert a *present* inability to comply with the order in question" as a defense).[4]

These orders give the respondents what could only be described as the bare minimum of justice. DHS has given them a perpetual runaround as respondents spent the better part of a year just trying to get DHS to pay them the benefits they are indisputably entitled to under the law and that they depend upon to live. The orders allow the respondents to bring DHS into court and force it to explain itself—something it has plainly been unwilling to do voluntarily in the dozens of OAH hearings where it refused to send counsel or offer any evidence or witnesses to back up its claimed technological haplessness. The court can then hold DHS to account

---

[4] Perhaps DHS could also challenge the legality of the underlying orders in such a contempt proceeding—a challenge that could then properly come before this court should it actually be preserved—though that is a trickier question that the parties have not briefed and I am not sure about. *Compare Maness v. Meyers*, 419 U.S. 449 (1975) (permitting collateral attack in a contempt proceeding on the legality of the underlying order), *with Walker v. Birmingham*, 388 U.S. 307 (1967) (precluding collateral attack on legality of underlying order in a contempt proceeding).

through a variety of judicial mechanisms that are unavailable to ALJs, most notably the power of contempt. My colleagues today relieve DHS of that minimal burden—despite its utter failure to contest any of these orders before OAH—on the mantle of some sense of justice that I cannot even discern, much less identify with. Permitting DHS to hide the ball and avoid answering for systemic violations of its legal obligations, all in the name of helping it avoid a date in Superior Court, is not what I'd call a just result here.

There are simply no exceptional circumstances that justify giving DHS a pass on its deliberate and protracted tactics not to contest these orders before OAH and, as the majority does, sending the parties back to square one more than two years after DHS repeatedly decided not to challenge these orders before OAH. Quite the contrary, I do not recall ever seeing a better candidate for us refusing to consider a challenge because the party had both forfeited and waived its challenges in the underlying proceedings. Those familiar with this court's precedents on forfeiture and waiver might even get the impression from today's majority opinion that we apply those doctrines selectively, depending on which "side of the v." the government—the usual beneficiary of this court's fairly routine application of the doctrines—is on. I dissent and would affirm the belatedly challenged orders.